(September 30, 1914.)

# BOISE DEVELOPMENT COMPANY, LTD., Appellant, v. BOISE CITY, a Municipal Corporation, Respondent.

### [143 Pac. 531.]

CONTRACT OF MUNICIPAL CORPORATION—WHEN VOID—WHAT CONSTI-
TUTES DEBT OR LIABILITY UNDER SECTION 3, ARTICLE 8 OF CON-
STITUTION — CONSTITUTIONAL CONSTRUCTION — WHAT CONSTITUTES
INDEBTEDNESS FOR ORDINARY AND NECESSARY EXPENSES — NEW
DEBT.

1. When a city enters into a contract by the terms of which
it becomes liable for a large expenditure of money, exceeding in
that year the income and revenue provided for it for said year,
without fully complying with all the provisions of sec. 3, art. 8 of
the constitution of Idaho relating to such expenditure, *held,* that
said contract is void.

2. The word "liability," as used in said section, has its ordinary
meaning, and signifies the state of being bound in law and justice
to pay an indebtedness or discharge some obligation.

3. Where uncertain and contingent claims for alleged damages
to the property of a corporation against a city are made a part
of the consideration of a contract entered into between them, and
said claims have never been liquidated, settled, or reduced to a
definite fixed amount of indebtedness against said city, *before* the
date of the contract, by a judgment or decree of court, arbitration,
compromise, nor in any manner whatever, if these sums are liqui-
dated, settled and fixed as a definite amount of indebtedness against
the city for the first time by the contract itself, *held,* that this
would constitute a *new debt.*

APPEAL from the District Court of the Third Judicial
District for Ada County.  Hon. Carl A. Davis, Judge.

Action for damages for breach of contract.  Judgment for
defendant, dismissing said action.  *Affirmed.*

Smead, Elliott & Healy and Hawley, Puckett & Hawley, for
Appellant.

A claim for uncertain and unliquidated damages is not a
debt.  (*Jackson v. Bell,* 31 N. J. Eq. 554.)

Our supreme court has had sec. 3, art. 8 of the constitution under consideration many times. On every occasion when the prohibition has been applied, there has been a true indebtedness involved. (*Ada County v. Bullen Bridge Co.,* 5 Ida. 79, 47 Pac. 818, 36 L. R. A. 367; *Ball v. Bannock County,* 5 Ida. 602, 51 Pac. 454; *Dunbar v. Board of Commrs.,* 5 Ida. 407, 49 Pac. 409; *Bannock County v. Bunting & Co.,* 4 Ida. 156, 37 Pac. 277.)

The case of *Feil v. Coeur d'Alene City,* 23 Ida. 32, 129 Pac. 643, 43 L. R. A., N. S., 1095, a case cited by the city, deals with a true indebtedness.

The California court, in which state the section is identical with our own, and the construction of which court has been quoted with approval by our own, has construed the section exactly as we contend for. (*McBean v. City of Fresno,* 112 Cal. 159, 53 Am. St. 191, 44 Pac. 358, 31 L. R. A. 794; *Smilie v. Fresno County,* 112 Cal. 311, 44 Pac. 556; *Johnson v. Bank of Lake,* 125 Cal. 6, 73 Am. St. 17, 57 Pac. 664; *Doland v. Clark,* 143 Cal. 176, 76 Pac. 958.)

Liability to pay money arising out of tort is not the creation of an indebtedness. (*Ft. Dodge Electric Light & Power Co. v. Ft. Dodge,* 115 Iowa, 568, 89 N. W. 7; *Conner v. Nevada,* 188 Mo. 148, 107 Am. St. 314, 86 S. W. 256; *Lorence v. Bean,* 18 Wash. 36, 50 Pac. 582; *Bloomington v. Perdue,* 99 Ill. 329; *Rice v. Des Moines,* 40 Iowa, 638; *Little v. Portland,* 26 Or. 235, 37 Pac. 911; *Cook v. Ansonia,* 66 Conn. 413, 34 Atl. 183; *Smith v. St. Joseph,* 122 Mo. 643, 27 S. W. 344.)

The compromise of an action or claim is not the creation of a debt. (*Chicago v. Pittsburg etc. Co.,* 244 Ill. 220, 135 Am. St. 316, 91 N. E. 422; *Conyers v. Kirk,* 78 Ga. 480, 3 S. E. 442.)

The contract does not create a new liability. Indebtedness already existing may be paid in a given year, though the sum so paid exceeds the income of that year. (*Hickey v. Nampa,* 22 Ida. 41, 124 Pac. 280.)

If the right to a compromise is considered best to the city's interest, the exercise of this discretion vested in the council will not be reviewed by the courts. (*Pike v. State Land*

*Board,* 19 Ida. 268, Ann. Cas. 1912B, 1344, 113 Pac. 447; *Murphy v. Chicago, R. I. etc. Ry. Co.,* 247 Ill. 614, 93 N. E. 381.)

Charles F. Reddoch, for Respondent.

It is safe to presume that if the city had sufficient funds available with which to carry out the scheme of improvement contemplated, an appropriation would have been made for that purpose, and in that event the contract might in some of its phases be legal, but the contrary conclusively appears. It provides for future improvements and future payments of at least $5,000 a year for at least five years, with no provision made at the time of the execution of the contract for defraying this expense, in direct violation of sec. 3, art. 8 of the constitution. (*Hickey v. City of Nampa,* 22 Ida. 41, 124 Pac. 280; *Veatch v. City of Moscow,* 18 Ida. 313, 21 Ann. Cas. 1332, 109 Pac. 722; *McNutt v. Lemhi County,* 12 Ida. 63, 84 Pac. 1054; *Ada County v. Bullen Bridge Co.,* 5 Ida. 79, 47 Pac. 818, 36 L. R. A. 367; *Dunbar v. Board of Commrs.,* 5 Ida. 407, 49 Pac. 409; *Bannock Co. v. Bunting & Co.,* 4 Ida. 156, 37 Pac. 277.)

A city indebtedness incurred during one fiscal year cannot be paid from the income and revenue of a future fiscal year, unless a fund is specially provided for the purpose, and collected therefor in such future year. (*Theiss v. Hunter,* 4 Ida. 788, 45 Pac. 2; *San Francisco Gas Co. v. Brickwedel,* 62 Cal. 641; *Feil v. City of Coeur d'Alene,* 23 Ida. 32, 129 Pac. 643, 43 L. R. A., N. S., 1095; *Ramsey v. City of Shelbyville,* 119 Ky. 180, 83 S. W. 116, 1136, 68 L. R. A. 300; *Eaton v. Mimnaugh,* 43 Or. 465, 73 Pac. 754; *O'Neil Engineering Co. v. Town of Ryan,* 32 Okl. 738, 124 Pac. 19; *Campbell v. State,* 23 Okl. 109, 99 Pac. 778.)

TRUITT, J.—This action was commenced by the appellant as plaintiff in the court below to recover damages from respondent, Boise City, for breach of a written contract entered into between appellant and respondent on the 27th day of December, 1911.

The complaint sets out said contract in full, and, though the same is quite lengthy, for the reason that it is the basis of the action and there is much controversy as to the meaning and legal effect of its terms, we think it proper to give it in full as follows:

"This agreement, made and entered into this 27th day of December, 1911, by and between Boise City, a municipal corporation of the state of Idaho, acting herein by the duly elected and qualified mayor and clerk of said municipal corporation, by and through the authority of its duly elected and qualified common council, and Boise Development Company, Ltd., a corporation organized and existing under and by virtue of the laws of the state of Idaho, with its principal place of business at Boise City, Ada County, Idaho, Witnesseth:

"That whereas the said Boise City is the owner of certain real property commonly known and designated as the Julia Davis Park, lying and being along the north bank of Boise River, between the Ninth Street bridge and the Broadway bridge leading across said river from said city, part of which property is, at the present time bottom land of said Boise river, and being cut up by many small arms of said river, and said land is not in a compact form, and it is the desire of the said Boise City to fill in the wasted parts of said land and to establish a permanent park, and to grade and beautify said land, and otherwise improve the same, in order to get the same in shape, and in order to protect the same from the action of erosion of Boise river, and to place such embankments and structures, and to drive piles, and to do other necessary and proper work in order to protect the said land and to give the said river at this vicinity a uniform width and a uniform bank along the said north bank of said river between the said bridges hereinbefore mentioned;

"And whereas, the said Boise Development Company, Ltd., is owner of certain interests in certain real property lying along the south bank of said river and directly opposite and across said river from the property hereinbefore mentioned, belonging to said Boise City;

"And whereas, the said Boise City is desirous of reclaiming certain lands on the south bank of said Boise River, the same being opposite to the said Julia Davis Park and adjacent to certain property owned by the Boise Development Co., Ltd., and known as Boise City Park Subdivision, situate in Ada County, Idaho;

"And whereas, it is necessary and convenient, and to the best interests of said Boise City to establish a uniform width of said river between the said Broadway bridge and the said Ninth Street bridge, and also to establish uniform banks on the south and north banks of said river between the said bridges;

"And whereas, it is the intention of said Boise City from time to time to do such work and construct such dams, breakwaters and improvements as shall be necessary and proper to establish a uniform width, and to provide uniform banks on the said river between the said Ninth Street and the said Broadway bridges;

"And whereas, there is now pending in the District Court of the Third Judicial District of the State of Idaho, in and for Ada County, a certain action brought by the said Boise Development Co., Ltd., wherein Boise City has been made a party defendant, wherein it is sought to restrain the said city and others from the construction of a proposed wing dam or breakwater in the said Boise River between the said Ninth Street and Broadway bridges;

"And whereas, it is mutually desired between the said parties hereto to effect an amicable settlement of the controversy involved in said action, and to beautify and improve the north and south banks of said river between the said bridges;

"Now therefore, in consideration of the foregoing conditions and in consideration of the covenants, agreements and stipulations hereinafter set out to be kept and performed, it is mutually agreed between the said Boise City, hereinafter known as a party of the first part, and the Boise Development Co., Ltd., hereinafter known as the party of the second part, as follows, to wit:

## "I.

"The party of the first part agrees to commence immediately upon the construction of such breakwaters or other structures on the south bank of said Boise river as shall be necessary to give the said Boise river a channel of uniform width between the said Ninth Street bridge and the Broadway bridge, and particularly to protect the said Boise City Park Subdivision, a property of the party of the second part, hereinbefore referred to, from damage which might be incurred to said property due to the usual and ordinary flow of said Boise river. It is further agreed that as a measure preliminary to the construction of said uniform channel, the party of the first part will proceed immediately to construct a wing dam from the south bank of the Boise river at a point on the north line of Boise City Park Subdivision as the same appears from the official plat thereof now on file in the office of the county recorder of Ada county, state of Idaho, opposite the point where the said river is divided by a certain bar or island lying between the said Subdivision and the said Julia Davis Park, said dam to extend from the said point to the head of said bar or island, and to be so constructed as to shut off the flow of water between said bar or island, and the said Subdivision, and to turn the same into the middle of said channel along the north side of said bar or island; and the said party of the first part will at the same time construct along the south bank of said river from the said wing dam to Broadway bridge, a temporary breakwater of rip-rap sufficient to protect the lands lying behind the said temporary protection from overflow or erosion due to the ordinary and usual flow of said river, until the completion of the permanent uniform channel hereinbefore provided for.

## "II.

"The party of the first part further agrees to fill in between the south bank of said river as established by the building of the said wing dam provided for in paragraph I hereof, with such solid filling material as earth, sand, gravel, or equally solid fill as it shall have at its disposal, and such

fill shall exclude garbage, sweepings and unsightly or uncleanly materials likely to injure the sale of the property in said subdivision, or detrimental to health; to level the same after filling, and to plat, grade, construct, maintain and sod the said property thus reclaimed as a public park. It is further agreed that said reclaimed property shall not be filled to a higher level at any point of the same than the present street grade of Earle Street in said subdivision as platted. The party of the first part further agrees to expend in the reclaiming, filling and improving the park on the south side of said Boise river, at least $5,000 each and every year from and after the date of this agreement for a period of at least five years and to complete the said work of establishing a uniform channel, reclaiming the said property and filling, grading and sodding the same ready for opening as a public park, at a time not to exceed eight years from the date of this agreement.

## "III.

"The party of the first part further agrees to construct Riverside Drive as platted, to a grade to be furnished by the party of the second part, according to official plat of Boise City Subdivision and field notes thereof; to construct cement curbs along both sides of said drive and to plant desirable shade trees on both sides thereof at a distance of from twenty-five to forty feet apart, from point of intersection of said drive with Ninth Street Pike to the easterly end of said subdivision; to construct a cement sidewalk, or cause the same to be constructed, from the south end of Ninth Street bridge to the point of intersection of said drive with Ninth Street Pike, a distance of approximately three hundred to four hundred feet. Any fill acquired from grading down said drive shall be placed in the depression at the easterly end of said subdivision at the point where the old channel of the Boise river formerly flowed.

## "IV.

"The party of the first part also agrees, at some time not later than five years from the date hereof, to construct a sur-

Idaho, Vol. 26—23

face for such Riverside Drive of oil macadam or some other hard substance equally durable and desirable.

"Said drive shall be commenced at Ninth Street Pike not later than May 1, 1912, and shall be completed, surfaced, and graded in the style of a turnpike, with the exception of said oil macadam or other hard surface, to Broadway Bridge, not later than October 1, 1912.

"It is further agreed that no part of the cost of construction or of paving or surfacing said drive shall at any time hereafter be assessed against the abutting property in said subdivision, or against the owners thereof.

"The title to the said pile breakwater at present erected along the northerly line of said subdivision shall remain in the party of the second part, with the right to remove the same; if the same is not removed by the party of the second part, the party of the first part shall remove the same with as little destruction of materials as possible, to a level with the surrounding property as soon as the uniform channel is established on the south side of said river as herein provided for.

## "V.

"It is further agreed that no franchises for public utilities shall be granted on Riverside Drive or upon the park property along the north line of said subdivision, without the consent of the party of the second part; provided, however, that the party of the second part shall retain the right to lay gas, water, sewer and similar mains and tubing under Riverside Drive and the said park property to Boise river; and the party of the first part hereby agrees that the party of the second part, its agents or assigns, shall be granted the right to cross the said drive and park property at the westerly end thereof with the tracks and rights of way of a railroad which shall connect with the railroad to be built along Ninth Street Pike, pursuant to the franchise heretofore granted by the county of Ada to J. S. Clark and A. R. Smith, and similar trackage on Seventh, Eighth or Ninth streets in Boise City, if the common council of said Boise City shall grant a franchise for such trackage and right of way.

## "VI.

"It is further agreed that no scenic railways, merry-go-rounds or other amusement devices of a like nature shall be constructed on said park property, and that no zoological gardens or exhibits shall be established thereon. No pavilions or other structures shall be placed in said park closer to the said subdivision than one hundred and fifty feet from the north line of said Riverside Drive.

"In consideration of the foregoing terms and stipulations on the part of the party of the first part, the party of the second part agrees as follows:

## "I.

"To dismiss the action now pending between the parties hereto as set out hereinbefore, at its own proper cost.

## "II.

"To furnish for the use of the party of the first part a plat of said Boise City Park Subdivision and adjacent property with surveyors' notes and all data pertaining to the same.

## "III.

"Party of the second part further agrees to construct a cement sidewalk along the south line of Riverside Drive and inside the south curb line of the same, to a grade to conform to the grade of said street and the southerly curb thereof, within twelve months after the completion of said curb.

## "IV.

"To define the southerly line of Riverside Drive as platted, and stake the same off on the ground, and to establish the grade of the same prior to the time set for its construction.

## "V.

"To execute properly and to deliver to the party of the first part, a quitclaim deed to all the right, title and interest of the party of the second part in and to said Riverside Drive, Tract 'A,' and that part of Lots 9, 4, 13, and Tract 'C,'

lying northerly from the southerly line of said Riverside Drive as platted, and easterly from the Ninth Street bridge across said Boise River; it being the intention of the party of the second part to convey by said deed, all its right, title and interest in and to any and all lands and riparian rights lying northerly from the said southerly line of said drive and easterly from the said bridge, said land to be used exclusively for park purposes.

"Said deed to be drawn as above set out, properly executed and placed in escrow in the hands of some third party, to be delivered to the party of the first part herein when his contract shall have been executed according to the terms hereof; and in the event of default or failure on the part of the said party of the first part in the execution of this contract, said deed shall be returned to the party of the second part, and this contract shall be null and void, and of no force and effect.

"In witness whereof, The party of the first part has, by resolution of its common council, duly and regularly passed, caused these presents to be executed, signed by its mayor and attested by its city clerk, under the official seal of said Boise City; and the party of the second part has caused these presents to be executed, signed by its president and attested by its secretary, under the corporate seal of the Boise Development Co., Ltd.

"This agreement executed in duplicate at Boise City, Ada county, Idaho, this 27th day of December, 1911."

This contract was duly executed as to form.

The complaint further alleges performance of this contract on the part of plaintiff as far as permitted by the defendant. It alleges a breach of the same by the defendant and claims damages therefor in the aggregate sum of $53,142.70, with costs and disbursements.

To this complaint the respondent interposed a demurrer on the ground that the same does not state a cause of action for various reasons; that two or more causes of action were improperly united; for ambiguity and uncertainty; and also filed a motion to strike out certain portions of the complaint,

and a motion requiring appellant to elect as to whether it would proceed upon the alleged breach of said contract or for certain torts alleged to have been committed by defendant both prior and subsequent to the execution of said contract.

There are numerous points raised by the pleadings, and some of them are presented in the briefs of the parties, but only two questions were argued at any considerable length, these being whether the contract sued on is void under sec. 3 of art. 8 of the state constitution, and if not, then whether it is *ultra vires* under the powers granted to the mayor and council by the charter of the city. As either of these points would be a bar to the action if sustained, we deem it unnecessary to pass upon them both if the first one decided in its order is sustained. As the first question presented and argued by respondent is as to whether said contract is void under the inhibition of sec. 3 of art. 8 of the constitution of Idaho, we will consider that in its order, for if the contention of respondent is sustained as to that point, it is decisive of the case. This section is as follows:

"No county, city, town, township, board of education, or school district, or other subdivision of the state, shall incur any indebtedness, or liability, in any manner, or for any purpose, exceeding in that year, the income and revenue provided for it for such year, without the assent of two-thirds of the qualified electors thereof voting at an election to be held for that purpose, nor unless, before or at the time of incurring such indebtedness, provision shall be made for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and also to constitute a sinking fund for the payment of the principal thereof, within twenty years from the time of contracting the same. Any indebtedness or liability incurred contrary to this provision shall be void. Provided, that this section shall not be construed to apply to the ordinary and necessary expenses authorized by the general laws of the state."

Under this section the point raised by the respondent is that by the terms of said contract an indebtedness or liabil-

ity is incurred exceeding the yearly income of the city and against said constitutional requirements.   The appellant takes issue with respondent on this point and maintains that the city does not incur any indebtedness or liability by the terms and conditions of said contract.   But before taking up the propositions of law presented in the case, it may be well to examine the contract in regard to what the city is required to do in order to comply with its provisions and obligations. First, the city agrees to commence immediately upon the construction of breakwaters or other structures necessary to confine the flow of the Boise river to a channel of uniform width between the Ninth street bridge and the Broadway bridge, a distance of about half a mile in length.   The Ninth street bridge is 325 feet in length, and the Broadway bridge is something near the same, so that these breakwaters and other structures would be required to confine the waters of the river in a channel of about 300 feet in width, which, owing to the volume of water and the nature of its banks, would in itself be no small job.   But the city in the same section of the contract further agrees to proceed immediately to construct a wing-dam from the south bank of the river at a point on the north line of Boise City Park subdivision, opposite the point where the river is divided by the island lying between said subdivision and Julia Davis Park.   The city also agrees at said time to construct along the south bank of said river from said wing-dam to Broadway bridge a temporary breakwater of riprap sufficient to protect the lands behind the same from overflow or erosion till the permanent channel is completed.

Now, the construction of these works must immediately commence; and it will be noticed that nothing is said as to their cost or how they are to be paid for, which is a very important matter with the people who will have to pay for them.   Then the contract further provides that the city shall fill in between the south bank of the river as established by said wing-dam and breakwater down to or near the Ninth street bridge, making a tract of about forty acres, with such solid filling material as earth, sand, gravel or equally solid

fill as it shall have at its disposal; to level the fill, plat and construct it into a public park.  Now, if the city did not have the material for this fill at its "disposal," the question will arise as to where or how this material could be obtained; and here is where the first mention is made as to the paying for the expenses of any of this work.  The contract says at this point that the city in this reclaiming work shall expend at least $5,000 each year for five years from the date thereof.  The city might expend more, and we think it quite probable that it would have to expend much more than the minimum sum in order to complete this work in the five years providing for such yearly payments.

It is further provided that the city shall construct Riverside drive and do various other things, all requiring more or less expense, and it must all be complete within eight years from date of contract.  It is true that the appellant corporation agrees to do certain things on its part that are specified in said contract as the consideration for the terms and stipulations on the part of the city, but there is nothing in the record other than the contract itself to enlighten this court as to the value of these things.  However, this is unimportant from our viewpoint, because we are not passing upon whether this is a favorable deal for the city, but the question is: Did it incur a debt or liability when it executed the same?  And we submit that under a fair and reasonable construction of said section of our constitution, it did.  If an agreement to perform this vast amount of work does not incur a liability on the part of the city, then the words "incur" and "liability" must each be given meanings unknown to lexicographers.

Black's Law Dictionary, 2d edition, defines the word "incur" as follows: "Incur.  Men contract debts; they incur liabilities.  In the one case they act affirmatively; in the other, the liability is incurred or cast upon them by act or operation of law."  Bouvier, in his Law Dictionary, defines the word "liability" as follows: "Responsibility.  The state of one who is bound in law and justice to do something which may be enforced by action.  This liability may arise from contracts either express or implied, or in consequence of torts

committed.    The state of being bound or obliged in law or justice.''

Coming now to the application of said section of the constitution to the contract in question, it will be observed that it refers in terms to the incurring of indebtedness or liability, not expressly to the payment of the indebtedness or the discharge of the liability.

In the case of *Feil v. City of Coeur d'Alene,* 23 Ida. 32, 129 Pac. 643, 43 L. R. A., N. S., 1095, this section came directly before this court for consideration, as it was urged by the appellant Feil against the validity of an ordinance of the city of Coeur d'Alene providing for the purchase by the city of a waterworks system, at that time in operation in the city.    As a very similar question was presented to the supreme court of Washington in *Winston v. City of Spokane,* 12 Wash. 524, 41 Pac. 888, that case was urged by respondent, City of Coeur d'Alene, in support of its ordinance, but the same was held void, for the reason that it would create a *liability* against the city.    Mr. Justice Ailshie delivered the opinion of the court and reviewed the Winston case and other cases where it had been followed as authority in construing constitutional provisions of other states similar to sec. 6, art. 8 of the constitution of Washington.    Referring to the Winston case in said opinion, this court says:

''Since this decision was announced by the supreme court of Washington, in 1895, a number of very similar cases have arisen throughout the various states, and the opinions of the courts adhering to this view have invariably referred back to the Winston case and relied upon it as an authority, and so by citing that case and the various cases from other states that have followed the doctrine of that case, a line of authorities has been built up within the last fifteen years which tend to support the contention made by the respondent in this case and to sustain the validity of the ordinance here in question. . . . . An analysis and comparison of the constitutional provisions above quoted will at once disclose, however, that none of them were so sweeping and prohibitive in their terms as sec. 3, art. 8, of our constitution above quoted.

We shall not take the time or space here to draw the comparison and analyze the differences existing between those constitutional provisions and our own, but will rather content ourselves with a brief analysis of our own constitutional provision, and point out what seems to us the peculiar and decisive provisions of our own constitution which should be held as conclusive in this case.''

And further on in the opinion, this language is used:

''The courts to whose decisions we have above referred have indulged in various subtleties and refinements of reasoning to show that no *debt* or *indebtedness* is incurred where a municipality buys certain property and specifically provides that no liability shall be incurred on the part of the city, but that the property shall be paid for out of a *special fund* to be raised from the income and revenue from such property. The reasoning, however, of those cases utterly fails when applied to our constitution, for the reason that none of those cases deals with the word 'liability,' which is used in our constitution, and which is a much more sweeping and comprehensive term than the word 'indebtedness'; nor are the words 'in any manner or for any purpose' given any special attention by the courts in the foregoing cases. The framers of our constitution were not content to say that no city shall incur any indebtedness 'in any manner or for any purpose,' but they rather preferred to say that no city shall incur any *indebtedness or liability* in any manner, or for any purpose. It must be clear to the ordinary mind on reading this language that the framers of the constitution meant to cover all kinds and character of debts and obligations for which a city may become bound, and to preclude circuitous and evasive methods of incurring debts and obligations to be met by the city or its inhabitants.''

In the case at bar, appellant corporation seems to rely mainly on *McBean v. City of Fresno*, 112 Cal. 159, 53 Am. St. 191, 44 Pac. 358, as authority in support of its contention that said contract is valid, and as this case is not referred to in *Feil v. City of Coeur d'Alene*, we will briefly consider it. This was a case where the court, no doubt, had strong equi-

table grounds in favor of the validity of the contract upon which the action was based. The facts show that the city of Fresno had provided a sewer system for the city, but no natural means were available for the disposition of its sewage. It had provided sewers but had made no provision for the care of their contents. These must necessarily be discharged beyond the city limits, but before the sewers could be used, grounds must be secured for the reception and treatment of the waste matter. In these circumstances, the contract was entered into with McBean. By the terms of this contract he agreed to take care of the sewage of the city for five years for the sum of $4,900 per annum, payable quarterly. He gave a bond in the sum of $10,000 for the faithful performance of the contract on his part. Now, in these circumstances there was an urgent necessity for the city to make some arrangements to dispose of its sewage at once. The quarterly expense was small, and the price was probably very reasonable. Moreover, the charter of the city authorized the levying and collection of a tax not exceeding ten cents on each $100 for a sewer fund, and it was conceded that the tax which would be collected for that fund was ample to meet all sums that might be needed to pay McBean under said contract. Because of the merit of the contract and the pressing necessity for some means to take care of the sewage of the city, we believe the better judgment of the court was somewhat biased by its desire to actually benefit the people of the city. In fact, as a matter of public policy, the execution of this contract might well be justified. But when the court attempts by argument to escape the force and effect of the constitutional provision under consideration and show that the city incurred no *liability* under the contract, we submit that its reasoning is not sound. It says:

"In a certain very restricted sense it may be said that a liability is created by a contract such as this; but to call it a present liability for the aggregate amount of the payments in the contract contemplated thereafter to be made is not legally permissible. A liability to the city would arise upon breach of contract, but the constitution never meant to protect the

city from the consequences of its own wilful and tortious acts.''

But if this contract was valid, would not the courts intervene to compel the city authorities to comply with all its terms and provisions? Conceding that it is true that it would not be ''legally permissible'' to call the aggregate amounts in the contract to be paid a present *debt,* then we submit that it would be a ''present *liability*'' for such aggregate amounts. If the contract was valid, by its terms $1,225 would become due at the end of each quarter of each year of its existence, as the services were performed, from the beginning of said services to the expiration of the five years for which it was made, and this sum would then be a *debt,* but the city incurred a *liability* for the aggregate sum of $24,500 at the date the contract was executed.

If A by a valid contract employs B to work for him for the term of one year at $50 per month, payable at the end of each and every month, would this contract not be a liability on A as soon as executed? A debt of $50 would accrue thereon at the end of each month, but the liability would be incurred at the time the contract was entered into. But in said opinion the court further says: ''A liability to the city would arise upon breach of contract, but the constitution never meant to protect the city from the consequences of its own wilful and tortious acts.'' It is by no means apparent to this court as to how any liability could arise upon the breach of a contract that neither imposed a *debt* or a *liability.*

But appellant also maintains that the obligations entered into by the city in the contract under consideration do not constitute a *new debt* or *liability,* because it simply assumed and entered into terms for the payment of existing debts or liabilities which grew out of certain torts committed by the city against appellant, and therefore does not come within the inhibitions of said section 3.

In support of this point, appellant in its brief cites the cases of *Hickey v. City of Nampa,* 22 Ida. 41, 124 Pac. 280, *Pike v. State Land Board,* 19 Ida. 268, Ann. Cas. 1912B, 1344, 113 Pac. 447, *Murphy v. Chicago B. & Q. Ry. Co.,* 247 Ill.

614, 93 N. E. 381, and *Carson v. City of Genesee,* 9 Ida. 244, 108 Am. St. 127, 74 Pac. 862. After an examination of these authorities, we are persuaded that none of them sustain appellant's contention, but as we consider *Hickey v. City of Nampa* the nearest in point of these authorities, we will therefore review the case at some length.

The action was brought for the purpose of procuring a writ of injunction restraining the issuance and sale by the city of Nampa of certain municipal coupon bonds in the sum of $37,000. The city owned a water system consisting of a pumping station and a system of wooden pipes. The city also owned certain fire equipments and appurtenances for the fighting and extinguishing of fire. In July, 1909, a disastrous fire broke out in the business section of the city by which about $200,000 worth of property was destroyed. During the fire the water supply was exhausted, the water was pumped directly through the mains, and this resulted in bursting most of the wooden pipes, and the city was left without any fire protection. The mayor and council considered this a casualty within the purview of section 2270 of the Rev. Codes, that the repair and improvement of the water system and fire-extinguishing apparatus was a public necessity calling for immediate action. Under the stress of this necessity, they, by unanimous vote, determined to restore the water system in such a manner as to adequately protect the property in the city. To pay for the material and work for these improvements, city warrants were issued for various items of expense. In August, 1911, an ordinance was duly passed to issue bonds in the sum of $37,000 to pay off the indebtedness represented by these warrants. These were the facts before this court in that case, and it was held that the said bond issue was legal. In the opinion, delivered by Mr. Justice Ailshie, the position of the court is fully stated as follows:

"In the first place, we have no doubt but that the indebtedness which was incurred falls within the purview of sec. 2270 of the Rev. Codes, in that it was entailed as a result of a casualty or accident which could not have been foreseen

and provided for by the annual appropriation. The city of Nampa had duly and regularly exercised the power and authority conferred upon it by the provisions of subdivisions 36 and 37 of sec. 2238, Rev. Codes, in acquiring and maintaining a waterworks system and apparatus and appliances for extinguishing fires. In order for this property to be of any value to the city, it was necessary for it to be kept in repair. When the fire came and the waterworks system was impaired and rendered useless, it was necessary that the city repair and restore it. It was also equally necessary to have fire equipment and apparatus to enable it to properly utilize the water in case of fire. The vote of the council to make this expenditure and incur the indebtedness was authorized by unanimous vote, and was therefore a compliance with the requirements of sec. 2270. It appears in this case that the mayor and city council acted in good faith, and that this was a *bona fide* improvement and restoration of property within the purview and meaning of the statute. The city council could certainly not use this as a subterfuge for the construction or purchase of a new system of waterworks or other independent, separate or new property so as to contravene the provisions of sec. 3, art. 8, of the constitution. . . . . The same section, however, closes with this proviso: 'Provided, that this section shall not be construed to apply to the ordinary and necessary expenses authorized by the general laws of the state.' We take it that it was within the power of the legislature under this constitutional provision to say that an *expenditure*, though out of the *ordinary,* which is incurred for the purpose of repairing some damage done to city property or improving it in such manner as to render it serviceable to the city, falls within this proviso to the constitution. The repair and improvement of the property may be 'ordinary and necessary' and yet not occur frequently.''

And further on in said opinion it is stated: ''This was not the creation of any new indebtedness, but was rather the changing of the form of the indebtedness or paying an ordinary debt already incurred.''

We do not think the contention of appellant, that the consideration for the agreements entered into by the city in said contract is not a new debt or liability, is sustained by this authority. In *Hickey v. City of Nampa,* it is held that the debt was legally incurred under the proviso of said section 3, and it was a definite fixed liability on the city. The identical debt as evidenced by city warrants was simply changed into the form of bonds, and it was decided in that case that it was not a new debt. But in the case at bar, it cannot be ascertained from the contract, or anything else in the record, what the amount of the liability is that the city assumes thereby, and when we consider the sums of money claimed by appellant for alleged damages to its property by the city, the fact at once appears that said sums so claimed for such damages are uncertain, and contingent, and have never *before* the execution of said contract been liquidated, settled or in any manner reduced to a definite or fixed amount of indebtedness against the city by decree of a court, by arbitration, compromise or in any manner whatever; and if these sums are liquidated, settled and fixed as a definite amount of indebtedness by the contract itself, this amount would then constitute a *new debt.* Furthermore, if a court should attempt to enforce this contract, its specifications of the work to be done are so meager and indefinite and the sums to be expended thereon are so uncertain, that it would almost inevitably lead to dispute and litigation.

We think it would not be profitable to review the other authorities cited by appellant in support of the proposition that the consideration for the obligations entered into by the city in said contract did not constitute a new debt or liability, for, as we understand them, they are not in point on this proposition.

We are of the opinion, therefore, that under the authority of *Feil v. City of Coeur d'Alene,* the contract upon which this action is based by its terms plainly incurs a liability, if not a debt, upon the city of Boise, that the obligations of said contract do constitute a new debt upon the city, and we therefore hold that said contract is void.

The judgment of the trial court must be affirmed, with costs in favor of the respondent.

Sullivan, C. J., concurs.