670 P.2d 839

Gary ASSON and LeRae Asson, husband and wife, citizens of the City of Burley; Ransom H. Brown and Betty Brown, husband and wife, citizens of the City of Heyburn; and J.R. Simplot Company, Petitioners,

v.

CITY OF BURLEY; Charles Shadduck, Mayor of the City of Burley; James Parker, J. Garth Payne, Frances McDonald, Dale Doman, Walter Petersen, and Truman Bradley, as members of the City Council of Burley; City of Heyburn, Harold R. Hurst, Mayor of the City of Heyburn; and Wilford Wilcox, Dean Baker, David Mayes, and Larry McComb, as members of the City Council of Heyburn, Respondents.

Richard H. BOHLE and Paula L. Bohle, husband and wife; Blaine Jensen and Lillian D. Jensen, husband and wife; Charles B. Park and Billie F. Park, husband and wife; Clarence F. Bellem and Lillian B. Bellem, husband and wife; Magic Valley Foods, Inc., an Idaho corporation; Cameron Sales, Inc., an Idaho corporation, Petitioners,

v.

CITY OF RUPERT, William F. Whittom, Mayor of the City of Rupert, Clark Cameron, Dwinelle E. Allred, June Dombeck and Ronald E. Klebe, as members of the City Council of Rupert, Respondents.

Nos. 14719, 14809.

Supreme Court of Idaho.

Sept. 26, 1983.

Rehearing Denied Nov. 4, 1983.

Craig Meadows and Phillip M. Barber, Boise, for petitioners Asson, et al.

Roger D. Ling, Rupert, for petitioners Bohle, et al.

William Parsons, Burley, for respondent City of Burley.

Stephen A. Tuft, Burley, for respondent City of Heyburn.

Donald J. Chisholm, Burley, for respondent City of Rupert.

A.L. Smith, Idaho Falls, for intervenor City of Idaho Falls.

Peter B. Wilson, Bonners Ferry, for intervenor City of Bonners Ferry.

R.B. Kading, Jr., and R.M. Turnbow, Boise, for intervenor Washington Public Power Supply System.

Howard Humphrey, and Stanley Welsh, Boise, for intervenor Chemical Bank.

HUNTLEY, Justice.

In 1976, five Idaho cities [1] (parties to this action) entered into an agreement with the Washington Public Power Supply System (WPPSS) for future supplies of electrical energy to be generated by two planned nuclear power plants. Although the plant projects were later terminated, under the terms of the agreement the cities were nevertheless required to continue to pay their percentage shares of the bond obligations incurred, amounting to millions of dollars. Residents and purchasers of electricity of three of the five cities brought this petition for a writ of prohibition, pursuant to this Court's authority under Idaho Const. Art. 5, § 9 and I.C. §§ 7–401, 402, to prevent the respondent cities from raising municipal electric rates to cover their payment obligations. The petitioners allege the cities acted without constitutional authority when entering into the 1976 agreements.

The record shows that each of the five Idaho cities owns and operates an electrical distribution system that carries electricity within the city and to nearby areas.[2] However, only two of the cities have generating facilities (Idaho Falls and Bonners Ferry), and those facilities do not supply all of their power needs. Thus, each of the five cities relies on outside electrical power supplies. Since 1963 (and before, for several cities) the outside supplier has been the federal government, through its agency the Bonneville Power Administration (BPA). The BPA provides the Pacific Northwest region with comparatively inexpensive hydroelectric power generated at facilities along the Columbia River system.

In the late 1950's and early 1960's, Pacific Northwest cities were receiving forecasts of greatly increased future energy demands. It was expected that the Northwest's hydroelectric resources would soon be inadequate to meet the needs of the region's power users. During this period, and through the late 1960's and into the 1970's, cooperative efforts were made by electricity purchasers such as municipalities and utility districts to predict the region's future energy needs and to make plans to meet them. Organizations such as the Public Power Council and the Pacific Northwest Utilities Conference Committee involved utilities in the region in energy forecasting and planning activities.[3] Another organization, the Joint Power Planning Council, including BPA and many of its power customers, made a study of future energy requirements and concluded that new electrical generating plants would have to be built to keep pace with increasing power demands. A plan was developed which called for the construction of several thermal power plants.

In January 1971 and 1973, and September 1973, the five Idaho cities, together with other Pacific Northwest utilities, entered into agreements with WPPSS to purchase electrical "project capability" from three nuclear power plants to be constructed by

1. Burley, Rupert, Heyburn, Idaho Falls and Bonners Ferry (the latter two are in the suit as intervenors).

2. The essential facts were submitted by stipulation of all parties.

3. The Pacific Northwest Utilities Conference Committee was comprised of 130 public and

private utilities in the region. Each year it published the "West Group Forecast," a compilation of forecasts of "load growth" from each of the utilities in the region. Those forecasts supported predictions of power shortages by the 1980's.

WPPSS.[4] Financing for the three nuclear plants was arranged under a plan called "net billing." The cities were to purchase shares of project capability from WPPSS, payment for which was to be made out of city utility revenues. The cities would then assign their project capability to BPA, which would reimburse the cities by reducing their wholesale power bills in amounts equal to their payments to WPPSS. In this way, BPA would actually fund the WPPSS projects.[5]

Each city entered into the agreement with respect to these first three plants (referred to as Projects 1, 2, and 3) after passage by its city council of a resolution authorizing execution of the agreement. Each city also represented, in the form of an opinion letter from its counsel, that it had authority to enter into the agreements.[6] The cities had specified statutory authorization, by means of a provision enacted in 1971, to participate in a net-billing arrangement and purchase electrical power to be resold to BPA:

"I.C. § 50–342. Electric Power—Purchase or disposal.—In addition to the powers otherwise conferred on cities of this state, a city owning and operating an electric distribution system shall have the authority to purchase electric power and energy for the purpose of disposing of such power and energy to the United States of America, department of the interior, acting by and through the Bonneville power administrator, through ex-change, net billing or any arrangement which is used for supplying the needs of the city for electric power or energy, and such authority shall not be subject to the requirements, limitations, or procedures contained in sections 50–325 and 50–327, Idaho Code." [7]

The net-billing financing plan made it possible for BPA to assist in insuring future supplies for its electricity customers. Each participating utility pays WPPSS its share of the costs of developing the projects, and BPA gives the participant a credit in the amount of such payment on the BPA bill for power purchased by the participant.

In December 1973 the Public Power Council investigated the possibility of two additional power plants to be designed, financed and built by WPPSS. For various reasons (one of which was a 1973 Treasury Department ruling denying tax exempt status for bonds to finance additional thermal plants from which BPA would receive more than 25% of the energy output), the two newest plants (Projects 4 and 5) could not be financed under the same arrangements as Projects 1, 2 and 3, which had BPA involvement. During 1974 and the first half of 1975, the Public Power Council, BPA, WPPSS and various utilities discussed possible financing plans for Projects 4 and 5.

Although three nuclear plants were already being built, many Northwest utilities were still convinced that the future would bring energy demands well beyond the out-

---

4. WPPSS is a municipal corporation and joint operating agency authorized under Washington state laws to finance, construct, own and operate electrical generating facilities. It was established in 1957 and is composed of 19 public utility districts and four Washington cities. "Project capability" which the utilities contracted to purchase from WPPSS is a percentage share of the potential output of nuclear plants to be constructed. In the agreement it is defined as follows:

"the amounts of electric power and energy, *if any,* which the projects are capable of generating at any particular time (including times when either or both of the Plants are not operable or operating or the operation thereof is suspended, interrupted, interfered with, reduced or curtailed, in each case in whole or in part for any reason whatsoever), less Project station uses and losses." (Emphasis added.)

5. The participants would pay debt service on the bonds through their monthly payments to WPPSS, and BPA would, in effect, reimburse the participants.

6. Each city received a form opinion letter from WPPSS which it was required to follow in stating its authorization, as a prerequisite to entering into the agreement.

7. I.C. §§ 50–325 and 50–327 would have prevented sale of electrical power to BPA by the cities unless it was excess power. I.C. § 50–342 removed that limitation. The section was amended in 1981 and 1982.

put of existing and planned power plants. BPA customers were made aware of a possible "notice of insufficiency" in 1973 and thereafter. The "notice of insufficiency" was an official statement by BPA to its preference customers that it would not be able to supply them with sufficient electricity by the early 1980's. BPA informed its customers that unless a plan were created to provide for future power production it would be forced to issue its notice of insufficiency.[8]

The proposed additional nuclear plants were to be located at the same sites as Projects 1 and 3 to reduce costs. Costs were projected to be low in comparison to other alternative power facilities. Impelled by the region's forecasts of energy shortages and the apparent advantageous circumstances of pairing two new plants with projects already under construction, the cities entered into a second set of agreements with WPPSS in July 1976.

The agreements, in summary form, provided that WPPSS would use its best efforts to arrange financing for the two plants, to obtain regulatory permits, to issue and sell bonds, and to complete planning and engineering studies, arrange for construction and timely completion of the plants, and thereafter maintain the plants. Project 4 was to be completed in March 1982, and Project 5 in April 1984. If WPPSS failed to secure financing, or if the plants were not completed as planned, the participating cities were nevertheless bound

to pay their obligations. The agreement provided:

"The Participant shall make the payments to be made to Supply System [WPPSS] under this Agreement whether or not any of the Projects are completed, operable or operating and notwithstanding the suspension, interruption, interference, reduction or curtailment of the output of either Project for any reason whatsoever in whole or in part. Such payments shall not be subject to any reduction, whether by offset or otherwise, and shall not be conditioned upon performance or nonperformance by Supply System or by any other Participant or entity under this or any other agreement or instrument, the remedy for any nonperformance being limited to mandamus, specific performance or other [sic] legal or equitable remedy."[9]

The payment obligation of each city was based on its percentage share of the project capability purchased. The city pays its percentage of the projects' annual budget and fuel costs, including all of WPPSS' cost of ownership, debt service on bonds, and all other costs. The cities' obligation to pay was to begin on the earliest of three dates: (1) continuous operation of any plant; (2) July 1, 1988; or (3) one year after termination of any project.

Projects 4 and 5 were terminated in January 1982 when WPPSS was unable to secure sufficient financing to complete the plants. At the time, Project 4 was approximately 20% complete and Project 5 was approximately 16% complete.[10] Bonds had

---

**8.** The notice of insufficiency was finally issued in June, 1976. BPA's letter to the cities stated, in part:

"Bonneville has completed an analysis of the resources it estimates will be available for disposition and its requirements and commitments to supply firm energy in the year July 1, 1983, to June 30, 1984. As a result of this analysis, Bonneville has determined that the firm energy resources available to it will be insufficient in that year to supply in full the City's firm energy requirements, the firm energy requirements of other preference customers, and Bonneville's obligations to deliver firm energy to its other customers.

Therefore, in accordance with the provisions of the Power Sales Contract, I hereby

give notice, effective at 2400 hours on June 30, 1976, that in the year beginning July 1, 1983, and in each year thereafter during the term of the Power Sales Contract, Bonneville's obligation to supply firm energy to the City will be limited to an allocation, the amount of which will be computed according to the terms of Section 22 of the General Contract Provisions."

**9.** Section 6(d), p. 19 of the agreement, referred to as the "hell or high water clause."

**10.** The WPPSS Board of Directors and Executive Board terminated the projects by adoption of Resolutions no. 1203 and no. 34, giving as the reason WPPSS' inability to proceed due to financing conditions beyond its control.

been issued by WPPSS in the amount of $2.25 billion.[11]

Under the agreement, the cities' payment obligations are limited to revenues derived from the operation of their utility systems. Each participant agrees to establish, maintain and collect electrical charges adequate to cover its payment obligations. In the event a participant defaults, provision is made for the non-defaulting participants to assume payment of the defaulter's obligation, up to a maximum of 25% of their own obligations.

As they had done with Projects 1, 2 and 3, the cities submitted opinion letters stating they were authorized by law to enter into the Project 4 and 5 agreements. Although the two sets of agreements were essentially the same (both involved the purchase of project capability, under the same terms, and both contained the so-called "dry-hole liability" provision), the financing arrangements were different in one important aspect—involvement of BPA. In the Project 4 and 5 agreements, the cities are ultimately liable for the "dry-hole" risk, whereas in the earlier agreements the cities incur no expense for which they do not obtain electrical power in like amount from BPA. In that sense, the Project 1, 2 and 3 agreements were similar to power purchase contracts. The cities received electricity in proportion to their payments to WPPSS.

Petitioners allege the cities acted in violation of the Idaho Constitution, Art. 8, §§ 3 and 4, and Art. 12, § 4, when they entered into the Project 4 and 5 agreements. Since our analysis of the applicability of Art. 8, § 3 is dispositive of the case, we need not address the other constitutional provisions. Art. 8, § 3 states:

> "**Limitations on county and municipal indebtedness.**—*No* county, *city,* board of education, or school district, or other subdivision of the state, *shall incur any indebtedness, or liability, in any manner, or for any purpose, exceeding in that year, the income and revenue provided for it for such year, without the assent of two thirds (⅔) of the qualified electors thereof voting at an elec- tion to be held for that purpose, nor unless, before or at the time of incurring such indebtedness, provisions shall be made for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and also to constitute a sinking fund for the payment of the principal thereof, within thirty (30) years from the time of contracting the same. Any indebtedness or liability incurred contrary to this provision shall be void:* Provided, that this section shall not be construed to apply to the ordinary and necessary expenses authorized by the general laws of the state and provided further that any city may own, purchase, construct, extend, or equip, within and without the corporate limits of such city, off street parking facilities, public recreation facilities, and air navigation facilities, and for the purpose of paying the cost thereof may, without regard to any limitation herein imposed, with the assent of two thirds (⅔) of the qualified electors voting at an election to be held for that purpose, issue revenue bonds therefor, the principal and interest of which to be paid solely from revenue derived from rates and charges for the use of, and the service rendered by, such facilities as may be prescribed by law, and provided further, that any city or other political subdivision of the state may own, purchase, construct, extend, or equip, within and without the corporate limits of such city or political subdivision, water systems, sewage collection systems, water treatment plants, sewage treatment plants, and may rehabilitate existing electrical generating facilities, and for the purpose of paying the cost thereof, may, without regard to any limitation herein imposed, with the assent of a majority of the qualified electors voting at an election to be held for that purpose, issue revenue bonds therefor, the princi-

---

11. Each city's share of the principal amount of the bonds sold is as follows: Burley, $4.275 million; Rupert, $7.290 million; Heyburn, $5.782 million; Idaho Falls, $20.587 million; Bonners Ferry, $4.275 million.

pal and interest of which to be paid solely from revenue derived from rates and charges for the use of, and the service rendered by such systems, plants and facilities, as may be prescribed by law; and provided further that any port district, for the purpose of carrying into effect all or any of the powers now or hereafter granted to port districts by the laws of this state, may contract indebtedness and issue revenue bonds evidencing such indebtedness, without the necessity of the voters of the port district authorizing the same, such revenue bonds to be payable solely from all or such part of the revenues of the port district derived from any source whatsoever excepting only those revenues derived from ad valorem taxes, as the port commission thereof may determine, and such revenue bonds not to be in any manner or to any extent a general obligation of the port district issuing the same, nor a charge upon the ad valorem tax revenue of such port district." (Emphasis added.)

Since it is admitted that no election was held by any of the five cities to obtain approval of the electorate prior to entering into the agreements in question, petitioners contend the cities contracted indebtedness in violation of the Idaho Constitution, and their indebtedness or liability is therefore void. Respondent City of Heyburn, and intervenors WPPSS and Chemical Bank[12] argue, however, that Art. 8, § 3 does not apply to the financing arrangement in this case because that provision contemplates an indebtedness for which taxes would need to be assessed, and the cities' payment obligations here are to be satisfied out of utility revenues alone.

█ Such an interpretation, however, would ignore the plain language of the constitutional provision, which states that "[n]o ... city ... shall incur any indebtedness, or liability, in any manner, or for any purpose, exceeding in that year, the income

and revenue provided for it for such year, without the assent of two thirds (⅔) of the qualified electors thereof ...." While it is true that the provision goes on to add another requirement, relating to the collection of an annual tax to pay interest on the debt and a sinking fund to pay the principal, the latter requirement is simply sound fiscal policy and does not relate to the primary constitutional mandate of electorate approval of substantial and far-reaching municipal indebtedness. A financing plan which provides for amortization of the indebtedness by some means other than assessment of taxes might be held to satisfy that part of Art. 8, § 3 which calls for an assessment, but it cannot fulfill the requirement of voter approval.

City of Heyburn, WPPSS and Chemical Bank also contend that Art. 8, § 3 would be inapplicable under the rule distinguishing municipal indebtedness from "special fund" indebtedness.

It is urged that we overrule *Feil v. City of Coeur d'Alene,* 23 Idaho 32, 129 P. 643 (1912), and apply the "special fund" doctrine in this case. That doctrine, accepted by a great majority of cases,[13] holds that a municipality does not contract indebtedness or incur liability, within the constitutional limitation, by undertaking an obligation which is to be paid out of a special fund consisting entirely of revenue or income from the property purchased or constructed. *Feil* dealt with a decision by the city of Coeur d'Alene to purchase a municipal water system, to be financed by bonds which would be repaid out of a fund containing only the revenues derived from operation of the water works. It was argued that since no indebtedness was contracted by the city itself—but rather only by the bond fund—the expenditure did not come under Idaho Const. Art. 8, § 3. The *Feil* court rejected that argument, reasoning that Idaho's expansive constitutional provi-

---

12. Chemical Bank, a New York corporation, is trustee for the holders of bonds issued by WPPSS to finance construction of Projects 4 and 5.

13. For a list of other jurisdictions applying the special fund doctrine, see Moore, Constitutional Debt Limitations on Local Governments in Idaho—Article 8, Section 3, Idaho Constitution, 17 Idaho L.Rev. 55, 65 n. 50 (1980).

sion (which, unlike several other states' examined by the court, contained the word "liability" as well as "debt") included an indebtedness paid out of a fund separate from the city's general fund. The court was critical of "subtleties and refinements of reasoning" utilized to suggest that no liability is incurred where a special fund is involved. 23 Idaho at 49, 129 P. at 649. Since *Feil,* a series of cases have declined to apply the special fund doctrine. *See, Boise Development Co. v. Boise City,* 26 Idaho 347, 143 P. 531 (1914); *Miller v. City of Buhl,* 48 Idaho 668, 284 P. 843 (1930); *Williams v. City of Emmett,* 51 Idaho 500, 6 P.2d 475 (1931); *Straughan v. City of Coeur d'Alene,* 53 Idaho 494, 24 P.2d 321 (1932); *O'Bryant v. City of Idaho Falls,* 78 Idaho 313, 303 P.2d 672 (1956).

■ However, *Feil* and its quite extensive succession of authority no longer prevent application of the special fund exception because that exception has been made a part of Idaho law by way of amendments to Art. 8, § 3. *See, Idaho Water Resource Board v. Kramer,* 97 Idaho 535, 548 P.2d 35 (1976).[14] The first such amendment, passed in 1950, authorized cities to purchase or construct water and sewage systems, treatment plants, and off-street parking facilities to be financed by bonds, "the principal and interest of which to be paid solely from revenue derived from rates and charges for the use, and the services rendered by, such systems, plants and facilities . . . " Subsequent amendments have increased the scope of the special fund exception to include port districts (1964), public recreation facilities (1966), air navigation facilities (1968), and rehabilitation of existing electrical generating facilities (1976). We note that, with the exception of port districts, indebtedness of a city for any of the purposes listed, even though not subject to the tax assessment provision of Art. 8, § 3, is nevertheless specifically conditioned on voter approval.

The intent of the framers of the constitutional amendments, and the electorate through their ratification, is clear that approval of a municipality's qualified voters is necessary whether its Art. 8, § 3 indebtedness or liability is against the general fund of the city, and its tax revenues, or limited to a special fund of project-generated revenues.

■ It might be argued that since Art. 8, § 3 provides for "rehabilitation of existing electrical generating facilities" and makes no mention of construction of new facilities or indirect financing of new facilities through purchase of project capability, the latter purposes are not covered by the requirements of that section. However, it seems unreasonable to believe that the framers and ratifiers of the amendments intended for a city to obtain assent from a majority of its qualified voters to rehabilitate or repair its electrical plant and yet not obtain voter approval of the financing of completely new generating facilities, at perhaps several times the cost.

The better view is that the constitutional provision requires a city to obtain only a simple "majority" voter approval where the indebtedness undertaken is only for the rehabilitation of existing facilities (a purpose more similar to the "ordinary and necessary expenses" exception), whereas if the indebtedness is for the construction of wholly new facilities (obviously a much more extensive undertaking), then the "two thirds (⅔)" majority approval within the general application of the article would apply. This interpretation is substantiated by the 1972 amendment which divided the special fund exceptions into two groups: those requiring two-thirds voter approval and those requiring only a simple majority.[15] When the provision covering the rehabilitation of existing electrical generating facilities was

---

14. The court stated, "furthermore any doubt as to the precedential value of the *Feil* opinion has been removed by subsequent amendments by the people of this state to Art. VIII, § 3, which now authorizes a municipality to do what was impermissible at the time the case was decided," citing to *Schmidt v. Village of Kimberly,* 74 Idaho 48, 256 P.2d 515 (1953). 97 Idaho at 558, 548 P.2d at 58.

15. H.J.R. No. 73, 1972 Idaho Sess. Laws p. 1251.

**440**

added in 1976, it was placed within the second group.

Reasoning *a fortiori,* we cannot conceive of an interpretation of Art. 8, § 3 which would sanction the extensive, long-term indebtedness undertaken by the cities herein without an election.[16] Art. 8, § 3, if it has application to a city's issue of bonds to finance rehabilitation of its electrical generating facilities, surely applies to a city's guaranty of bonds issued to construct two new nuclear power plants.

■■■ Thus, were we to accept the argument that the cities' liability comes under the special fund doctrine, the indebtedness would still be without constitutional authority because Art. 8, § 3, requires voter approval of qualifying indebtedness regardless of the method or source of repayment. However, we do not believe the special fund exception is applicable here. The special fund doctrine is normally applied in situations where the city's indebtedness is for the purpose of building or buying revenue-producing property, and only the revenue produced from that particular property is used to repay the indebtedness. For example, a city might issue bonds to fund construction of a power generating station, the bonds being repayable from income generated by the power station. Such financial undertakings might be said to "pay for themselves," leaving no possibility of obligation on the city's general fund (requiring replacement by additional taxation). In the present case, the cities' obligation to pay off the WPPSS bonds has created no revenue-producing property. The cities receive no electrical power for their monthly payments to WPPSS, and must raise their rate charges on power they already purchased to create a fund out of which to pay WPPSS. In essence, they must impose a surcharge on their rate-paying residents and other electrical power users, for which they provide no additional service.[17] Indeed, far from qualifying as a special fund exception, this indebtedness might constitute a general obligation on the city for which it has nothing to show.[18]

16. The amortized monthly cost of each city's share of the $2.25 billion bond obligation, over 30 years, is:
Burley, $29,752.00 per month,
Rupert, $50,735.00 per month,
Heyburn, $40,244.00 per month,
Idaho Falls, $143,279.00 per month,
Bonners Ferry, $29,752.00 per month.
Simple mathematics reveals overall indebtedness ranging from a low of $10,710,720.00 for Burley and Bonners Ferry, to a high of $51,-580,440.00 for Idaho Falls. It is unthinkable to suggest that a constitutional provision intended to require voter approval of any debt which exceeded the income provided for it during one year does not apply to a $10.7 million debt for a city of 1,906 people (Bonners Ferry, 1980 census).

17. To the extent this surcharge imposes an obligation on the ratepayer unrelated to the quantity of electricity used, it could constitute a tax. Supposing the extremely unlikely situation of there being only one rate-payer in the municipality, or of the whole group of rate-payers passing a month without using any electricity, under the terms of its agreement with WPPSS, the city would be compelled to charge a "rate" sufficient to make its monthly payment to WPPSS no matter how unreasonable it would be as to the single rate-payer, or in spite of the fact that no service was provided. The supposition may be fanciful, but it serves to illustrate the nature of the revenues collected by the city; they are not properly "utility revenues." *See,* 12 McQuillin, *Municipal Corporations* § 35.38 (1970).

18. In light of the contractual requirement that non-defaulting participants assume the burden of paying a defaulting participant's share (up to 25% of their individual shares), there arises the question of a defaulting municipality's liability to its fellow participants, which may elect to sue it. They would not be bound as WPPSS is to recovery only against the special fund, the agreement providing:

"If the Participant shall fail or refuse to pay any amounts due to Supply System hereunder, the fact that other Participants have assumed the obligation to make such payments shall not relieve the Participant of its liability for such payments, and the Participants assuming such obligation, either individually or as a member of a group, shall have a right to recovery from the Participant. Supply System or any Participant as their interests may appear, jointly or severally, may commence such suits, actions or proceedings, at law or in equity, including suits for specific performance, as may be necessary or appropriate to enforce the obligations of this Agreement against Participants, which obligations shall include reasonable attorneys' fees in all trial and appellate courts." Section 17(e), pp. 48–9.

We now address the contention of WPPSS, Chemical Bank, and the City of Heyburn that the cities' indebtedness is excepted from the requirements of Idaho Const. Art. 8, § 3 by virtue of its being an "ordinary and necessary" expense. That proviso reads as follows: "Provided, that this section shall not be construed to apply to the ordinary and necessary expenses authorized by the general laws of the state . . . ." In our interpretation of this language, we are benefitted by a rather extensive history of case law. We note at the outset that this proviso consists of two requirements: (1) that the expense be ordinary and necessary, and (2) that it be authorized by the general laws of the state. *City of Pocatello v. Peterson,* 93 Idaho 774, 777, 473 P.2d 644, 647 (1970). We will address the "ordinary and necessary" requirement first.

Early cases interpreted the "ordinary and necessary" language very narrowly. The court often looked to the amount of the expense in proportion to the city or county's revenue for that year. In *County of Ada v. Bullen Bridge Co.,* 5 Idaho 79, 47 P. 818 (1896), the court stated,

"If it is claimed that this expenditure comes within the proviso of section 3, article 8, of the constitution, we answer that a construction of that proviso, as well as of the entire section, was given by this court in *Bannock Co. v. Bunting,* 4 Idaho 156, 37 Pac. 277, and we would suggest that an improvement involving an expenditure of nearly $40,000, where the revenue of the county for the year was only about $70,000, would not readily be classed as an 'ordinary and necessary expense.' It would be difficult, we apprehend, to name an expense under such

a construction that would not be 'ordinary and necessary.' If a necessity existed for the bridge, there was no conceivable excuse for not complying with the plainly expressed provisions of the constitution and the statutes. If these provisions of law are to be ignored or defeated upon flimsy technicalities, it is difficult to see what protection the people will have." *Id.* at 90, 47 P. at 823.[19]

*See also, Ball v. Bannock Co.,* 5 Idaho 602, 51 P. 454 (1897). Expenditures held *not* to be ordinary and necessary include: the construction of bridges, *Bullen Bridge, Dunbar, supra;* construction of a wagon road, *McNutt v. Lemhi Co.,* 12 Idaho 63, 84 P. 1054 (1906); purchase of a water system, *Woodward v. City of Grangeville,* 13 Idaho 652, 92 P. 840 (1907); construction of a schoolhouse addition, *Petrie v. Common School Dist.,* 44 Idaho 92, 255 P. 318 (1927); purchase of a street sprinkler, *Williams v. City of Emmett,* 51 Idaho 500, 6 P.2d 475 (1931). Expenditures held to be within the ordinary and necessary exception include: salaries of city officers and employees, *Butler v. Lewiston,* 11 Idaho 393, 83 P. 234 (1905); repair of city waterworks, *Hickey v. City of Nampa,* 22 Idaho 41, 124 P. 280 (1912); construction of a jail in a newly created county, *Jones v. Power Co.,* 27 Idaho 656, 150 P. 35 (1915); maintenance of streets, *Thomas v. Glindeman,* 33 Idaho 394, 195 P. 92 (1921); cost of employing school teachers, *Corum v. Common School Dist.,* 55 Idaho 725, 47 P.2d 889 (1935).

Comparison of these earlier cases reveals one clear distinction between those expenses held to be ordinary and necessary and those held not to be: *new* construction or the purchase of *new* equipment or facilities as opposed to repair, partial replace-

---

If other participants, either individually or as a group, bring an action against a defaulting municipality, a judgment obtained in the action would be assessed against the city (as opposed to its utility service, or revenues therefrom) as the contracting entity, and recoverable from the city's general fund.

**19.** In the *Bunting* case, the court held that the purchase of a site for a county courthouse, and building a courthouse, "is clearly not among

the ordinary and necessary expenses of the county. . . . It is clear that, if the commissioners could incur a debt for a courthouse site at a cost of $4,000, they might purchase one at a cost of $10,000, and proceed to erect a courthouse at a cost of $20,000, all of which would be in direct violation of the constitution." *See, Dunbar v. Board of Commrs.,* 5 Idaho 407, 49 P. 409 (1897). The *Bunting* court looked less to the nature of the expense than to the amount.

ment or reconditioning of existing facilities. Thus, the court could hold that the city of Grangeville was not authorized, except by compliance with the requirements of Art. 8, § 3, to purchase an existing water system from the estate of a deceased city resident in the *Woodward* case, *supra*,[20] but could hold that the city of Nampa was authorized (without voter approval) to repair and restore its present water system after it was badly damaged in an attempt to put out a downtown fire in the *Hickey* case, *supra*. Similarly, the city of Moscow's decision to *improve* its existing waterworks system and build a water storage tank, to provide a "more adequate water supply" was within the application of Art. 8, § 3 of the Constitution. *Durand v. Cline,* 63 Idaho 304, 119 P.2d 891 (1941). *See also, Miller v. City of Buhl,* 48 Idaho 668, 284 P. 843 (1930), (purchase of electric generating system, to be paid for from receipts from sale of power and light, held to be required to comply with Art. 8, § 3); *O'Bryant v. City of Idaho Falls,* 78 Idaho 313, 303 P.2d 672 (1956), (entering into agreement with natural gas distribution system to provide gas for city residents and vicinity held to be covered by requirements of Art. 8, § 3, Idaho Const.); *Straughan v. City of Coeur d'Alene,* 53 Idaho 494, 24 P.2d 321 (1932), (purchase by city of municipal lighting plant, and of waterworks system, held to be within application of Art. 8, § 3); *Reynolds Construction Co. v. County of Twin Falls,* 92 Idaho 61, 437 P.2d 14 (1968), (construction of courthouse annex covered by Art. 8, § 3).

While it is true that recent cases dealing with application of Idaho Const. Art. 8, § 3, have interpreted the "ordinary and necessary" language more broadly,[21] they are not inconsistent with earlier case authority. In *Hanson v. City of Idaho Falls,* 92 Idaho 512, 446 P.2d 634 (1968), the court held that establishment of a "policeman's retirement fund" was within the ordinary and necessary proviso, reasoning that it was merely an extension of the city's salary compensation and support of its municipal law enforcement staff. Early cases were clear in ruling that salaries of municipal employees and related expenses are ordinary and necessary. *See, Corum v. Common School Dist., supra; Butler v. Lewiston, supra.*

In *City of Pocatello v. Peterson,* 93 Idaho 774, 473 P.2d 644 (1970), the court held that while repair and renovation of a municipal airport were not "inherently 'ordinary and necessary expenses' " the particular facts of that case brought them within the constitutional category. In its opinion the court stressed the upkeep and maintenance aspect of the city's expenditure. The court noted that the passenger terminal was an "unsound structure." Thus, while construction of a "wholly new terminal building" (see dissent of McFadden, J., *Id.* at 779, 473 P.2d at 649) might be viewed as an expenditure not traditionally considered ordinary and necessary, the court's emphasis on the obsolescence and unsafe condition of the twenty-year-old facility places it within the "repair or maintenance" line of case authority. The court may have considered the expenditure in light of the city's obligation to maintain a safe, sound structure and the concomitant potential legal liability for failure to do so, which liability might itself create an ordinary and necessary expense. *See, Butler v. City of Lewiston, supra.*

The question is whether the cities' belief that there would be inadequate power supplies several years in the future is sufficiently analogous to the cases which hold that repair or reconditioning of existing facilities is an ordinary and necessary expense. It is argued that the expenditure was certainly necessary in light of BPA's notice of insufficient power supplies by

---

**20.** "It will thus be seen that the ordinary and necessary expenses of said municipality may be contracted for by said city without any vote of the people, but where an expense is proposed to be incurred which exceeds the income and revenue provided for any year, such as the construction or purchase of a water system, or a part of such system, the same cannot be done without the assent of two-thirds of the qualified electors of said city." 13 Idaho at 660, 92 P. at 842.

**21.** *See,* Moore, *Constitutional Debt Limitation, supra.*

1983. Although hindsight tells us the cities were mistaken (there has turned out to be more than adequate electrical power from the same facilities existing in the early to mid 1970's), there is no way the cities could have known otherwise from existing information. However, we need not decide whether the expenditure was "necessary" within the meaning of Art. 8, § 3, for we hold that it was not "ordinary." "Ordinary" means "regular; usual; normal; common; often recurring ... not characterized by peculiar or unusual circumstances." *Peterson, supra,* 93 Idaho at 778, 473 P.2d at 648. It would be difficult to apply these adjectives to the WPPSS agreement. It was a colossal undertaking, fraught with financial risk. It was open-ended: the cities could not have known what their ultimate debt or liability would be. One cannot stretch the meaning of "ordinary" to include an expense for which there could not be, until years later, certainty of limits. The funding agreement left the Idaho cities with extensive indebtedness—yet no ownership, and minimal control, and only the possibility of electricity. Further, the agreement was for the construction of nuclear power plants, at an expense unencountered in the history of these cities' power ventures. One could conceive of a number of words to describe this undertaking, but "ordinary" would not be one of them.

■ We turn now to the second requirement of the constitutional proviso: that the expenditure be authorized by the general laws of the state. While an Idaho municipality is authorized to "acquire, own, maintain and operate electric power plants, purchase electric power, and provide for distribution to the residents of the city", I.C. § 50–325, and may purchase for resale to BPA "electric power and energy" under a net-billing agreement, I.C. § 50–342, we can find no statutory authorization for the purchase of "project capability" where such purchase comprehends the payment of long-term indebtedness for which no power may be supplied, and for which no ownership interest is acquired. The municipality is neither acquiring, owning, maintaining, or operating a plant, nor purchasing electrical power. It is underwriting another entity's indebtedness in return for merely the possibility of electricity. Thus, we hold that the agreement entered into by the Idaho cities and WPPSS does not come within the ordinary and necessary proviso of Art. 8, § 3 of the Idaho Constitution, and that section consequently having application in this case, the agreement is void as to the cities, who were acting *ultra vires* by obligating their residents without an election and compliance with the constitution.

We note that we have had at issue before us only the agreement relating to Projects 4 and 5. The cities' authorization to enter into Project 1, 2 and 3 agreements is not at issue, and as we have pointed out, the two sets of agreements are sufficiently different to make much of our holding not applicable even by analogy to the earlier agreements, which we perceive to be in the nature of power purchase contracts more than long-term debt obligations. Since we hold that the cities' agreements as to Projects 4 and 5 are void, it follows that the alternative writ of prohibition in these consolidated cases is hereby made permanent.

DONALDSON, C.J., and SHEPARD and BISTLINE, JJ., concur.

BAKES, Justice, dissenting:

I cannot join in the majority opinion. If viewed at the time of inception, instead of with hindsight, the contracts under analysis here should withstand any constitutional attack the petitioners could muster. It is only because, through hindsight, the majority can see what a "bad deal" the cities have made that they now attempt to extricate these cities from their precarious position through a unique interpretation of our constitution as applied to the facts of this case. Clearly, the contracts under consideration comply with any constitutional requirement. Analysis under Art. 8, § 3, reveals that (1) the obligation under the agreements is not the type of obligation contemplated under Art. 8, § 3; and (2) that even if the above reason fails, the agreements should still be upheld under the "ordinary

and necessary" exception to the requirement of a citizens' election. Analysis under Art. 8, § 4, and Art. 12, § 4, leads to the same conclusion. Those sections do not invalidate these agreements because (1) the agency with whom the cities contracted is a public agency, and those sections merely prohibit contracts with private entities; and (2) there can be no lending of the credit of a public entity if the general fund of that entity is not liable on the obligation. Because these agreements withstand scrutiny under all of these constitutional provisions, the agreements should be upheld.

This is not to say that the cities are liable on these contracts. Our only concern in this case is the constitutionality of the cities' actions in entering into these contracts. This opinion would not preclude the cities from asserting any defenses to formation of these contracts that they might bring in another forum. In fact, it appears from the record that these cities have been discharged by a Washington trial court because of the action of the Washington Supreme Court in invalidating the contracts as to the Washington defendants. We should not bend our own Constitution in an effort to release from liability public entities who have improvidently, but constitutionally, entered into contracts from which they may also be relieved because of contractual defenses.

## I

### A

The obligation "incurred" by the cities under these agreements is not the type of "indebtedness or liability" contemplated by Art. 8, § 3. That section contemplates the type of liability or indebtedness that will be repaid by the collection of an annual tax. Thus, the section provides some protection for the taxpayers who will be required to pay such annual tax. It requires cities to go to those taxpayers and obtain their assent to the liability or indebtedness incurred by submitting the matter to an election. However, under these agreements, no tax will ever be required. The liability in question is not payable from the general funds of the city. By the terms of the contract itself, it is payable only from revenues obtained from the sale by the cities of electric power. The sole source of revenue from which the cities are obligated to make payment to WPPSS is the electric utility rates charged only to customers of the electric utilities operated by the cities, most but not all of whom are located within the cities. No tax funds are ever involved under this contract. Because this obligation can never be a liability on the general city fund, it is not the type of liability contemplated under Art. 8, § 3; thus, Art. 8, § 3, should not render the agreement void.

### B

Another reason exists that should validate the Participants' Agreements under Art. 8, § 3. That section provides for an exception to the requirement of a citizens' election where the liabilities are "ordinary and necessary expenses authorized by the general laws of the state." The agreements were contracts for the acquisition of electricity. These participant cities were lawfully in the business of providing electricity to their residents and surrounding areas, and faced with a future shortage of electricity, the entering into of these agreements to provide a future source of electricity was an "ordinary and necessary" function of a city's business of providing such electrical power.

This Court has recognized that the "ordinary and necessary" exception shall be applied on a case by case basis. The cases considered by this Court have defined "ordinary and necessary" in various ways.

> " 'Ordinary' means 'regular; usual; normal; common; often recurring ....' ... 'Necessary' means 'indispensable.' ... An expenditure, although not of a frequently recurring nature, may nonetheless be 'ordinary and necessary.' " *City of Pocatello v. Peterson*, 93 Idaho 774, 778, 473 P.2d 644, 648 (1970).

This Court later defined "ordinary and necessary" as follows:

"An expense is ordinary if *in the ordinary course of the transaction of municipal business,* or the maintenance of municipal property, *it may be and is likely to become necessary.*" (Emphasis added.) *Thomas v. Glindeman,* 33 Idaho 394, 195 P. 92 (1921).

In *City of Pocatello v. Peterson,* 93 Idaho 774, 473 P.2d 644 (1970), we considered the question of whether a contract for the expansion of an airport facility was a contract for "ordinary and necessary" expenses within the exception to Art. 8, § 3. This Court considered several factors in the peculiar factual circumstances and concluded that the city's lease of the airport facility was ordinary and necessary. Several of the factors considered were: (1) the fact that the city was authorized by law to operate an airport; (2) that the city had in fact been operating an airport for a considerable period of time; and (3) that the existing facilities were inadequate and would in the future become obsolete and unsafe. The Court then concluded that for all of these reasons the repair and improvement of Pocatello's airport facility constituted an ordinary and necessary expense, thus falling within the exception to Art. 8, § 3. In its conclusion, the Court noted the following:

"Furthermore the repair and improvement of the Pocatello airport facility is essential for the proper growth and development of the area. This is especially so since the railroads, upon which public travel and communication were heavily dependent in yesteryear, are discontinuing passenger service to many cities." 93 Idaho at 779, 473 P.2d 644.

The factors noted in *City of Pocatello* in finding those expenses to be ordinary and necessary are also applicable in the contextual framework involved here. The cities here are authorized by law to operate electrical power plants and purchase electrical power for distribution to residents of the city. *See* I.C. §§ 50–325 and –342. All of these cities are in the business of distributing electrical power to their residents. Their residents are thus dependent upon these cities for their supply of electrical power. The source of power previously used by the cities was in effect becoming "obsolete," in that the BPA, from whom the cities had previously purchased their electrical power, had notified them that it would no longer be able to meet their electrical power needs by the early 1980's. The cities therefore were required to seek alternative sources of electrical power in order to continue service to their residents. All of these factors considered together indicate that this case is substantially similar to the question considered in *City of Pocatello v. Peterson, supra.* The liability incurred by the city was thus an ordinary and necessary expense, and the agreements do not violate Art. 8, § 3, of the Idaho Constitution and should not be struck down.

II

A

The majority opinion does not discuss Art. 8, § 4, and Art. 12, § 4, of the Idaho Constitution, but the agreements also withstand scrutiny under those sections. Those provisions read:

"[Art. 8] § 4. **County, etc., not to loan or give its credit.**—*No* county, *city,* town, township, board of education, or school district, or other subdivision, *shall lend, or pledge the credit or faith thereof directly or indirectly, in any manner, to, or in aid of any individual association or corporation, for any amount or for any purpose whatever,* or become responsible for any debt, contract or liability of any individual, association or corporation in or out of this state." (Emphasis added.)

"[Art. 12] § 4. **Municipal corporations not to loan credit.**—*No* county, town, *city* or other municipal corporation, by vote of its citizens or otherwise, *shall ever* become a stockholder in any joint stock company, corporation or association whatever, or *raise money for, or make donation or loan its credit to, or in aid of, any such company or association:* provided, that cities and towns may contract indebtedness for school, water sanitary and illuminating purposes: provided, that any city or town contracting such indebted-

ness shall own its just proportion of the property thus created and receive from any income arising therefrom its proportion to the whole amount so invested." (Emphasis added.)

Art. 8, § 4, and Art. 12, § 4, of the Idaho Constitution, are both sections intended to limit the power of municipal corporations to lend or pledge their credit to outside entities. Art. 12, § 4, prohibits the lending of credit, but makes a specific exception for indebtedness for "school, water, sanitary and *illuminating purposes.*" Art. 8, § 4, "goes further and is more restrictive" than Art. 12, § 4, *Village of Moyie Springs v. Aurora Mfg. Co.,* 82 Idaho 337, 353 P.2d 767 (1960). It absolutely prohibits the lending or pledging of credit directly or indirectly for any purpose whatever.

These two constitutional provisions have been interpreted in numerous Idaho cases. This Court has interpreted these provisions as prohibitions upon the lending of credit in aid of "private" associations or corporations. *See Board of County Comm'rs v. Idaho Health Facilities Authority,* 96 Idaho 498, 531 P.2d 588 (1975); *Village of Moyie Springs v. Aurora Mfg. Co., supra; School Dist. No. 8 v. Twin Falls County Mutual Fire Ins. Co.,* 30 Idaho 400, 164 P. 1174 (1917). As we stated in *Boise Redevelopment Agency v. Yick Kong,* 94 Idaho 876, 499 P.2d 575 (1972):

"The purpose of such a prohibition is clear. Favored status should not be given any private enterprise or individual in the application of public funds. The proceedings and debates of the Idaho Constitutional Convention indicate a consistent theme running through the consideration of the constitutional sections in question. It was feared that private interests would gain advantages at the expense of the taxpayers. This fear appeared to relate particularly to railroads and a few other large businesses who had succeeded in gaining the ability to impose taxes, at least indirectly, upon municipal residents in western states at the time of the drafting of our constitution. We are led to the firm conviction that only private interests

were intended to fall within the strictures of those sections relating to 'association,' 'corporation' and 'joint stock company.'" *Id.* at 883–84, 499 P.2d 575.

In *Yick Kong* we were considering the constitutionality of the creation of a redevelopment agency intended to rehabilitate the downtown area of the City of Boise. We held that the redevelopment agency, being a public and not a private enterprise, did not fall within the strictures of Art. 8, § 4, and Art. 12, § 4. We recently reaffirmed *Yick Kong* in *Idaho Falls Consolidated Hospitals v. Bingham County Board,* 102 Idaho 838, 642 P.2d 553 (1982). There we said:

"A review of the proceedings at the constitutional convention, the history of the west, and a similar statute that was in effect at the time the constitution was adopted, show that the delegates only sought to prevent private interests from gaining advantage at the expense of the taxpayer." 102 Idaho at 842, 642 P.2d 553.

In the present case WPPSS is not a private entity. Rather, it is a public corporation established by nineteen public utility districts in the State of Washington and the cities of Seattle, Tacoma, Richland and Ellensburg, and incorporated under the laws of the State of Washington. Thus, the evil sought to be avoided in Art. 8, § 4, and Art. 12, § 4, the lending of public credit to private enterprise, is not present here. Significantly, even if an incidental benefit to a profit-making enterprise is present, that in itself will not invalidate a program that has a public purpose. "Only if private interests are primarily benefited, must such programs with public goals be invalidated." *Board of County Comm'rs v. Idaho Health Facilities Authority, supra.* Here, although the argument may be made that certain private entities are benefited by the participation of the cities in the WPPSS agreement, the primary benefit of the agreements inures to the public users of electrical power. Thus, in the present case, and under these facts, there is *no* violation of Art. 8, § 4, or Art. 12, § 4.

A final reason for upholding these contracts lies in the arguments already presented. Art. 8, § 4, and Art. 12, § 4, both require a lending or pledging of the credit of the municipality. There can be no lending or pledging of that credit of the general fund itself is not liable on the obligation. As shown before, this obligation is payable only out of revenue from the utilities operated by the cities; thus, no general fund is liable. This is not the type of situation envisioned in these two articles of our Constitution.

Thus, under any analysis of these agreements and our Constitution, they should withstand scrutiny and should be enforced.