J. JONES, J.,
dissenting.
I dissent because I am unable to agree with the Court’s conclusion that article VIII, section 3 requires a vote of the people for contracts providing necessary supplies to carry on an on-going and long-standing municipal service. The framers of the Idaho Constitution were practical people. Their words and deeds indicate a dichotomy between new programs or construction, which were to require a vote of the people, and support of existing governmental functions, which were to be exempt from a vote by virtue of the Proviso Clause. As we observed in Asson v. City of Burley, 105 Idaho 432, 670 P.2d 839 (1983), that dichotomy has long been recognized in our decisions. It makes sense and should continue to be observed.
The concept I advance is by no means revolutionary. It plays a part in our everyday life. For example, when the family is considering the acquisition of a household pet, the decision must be made with deliberation and care. All of the pros and cons need to be carefully weighed before taking on the obligations attendant with a pet. After all, there will be much involved in the continuing feeding and care of the animal. Once the pet is acquired, the attendant and anticipated long-term obligations kick in. There is no longer the need for careful deliberation with regard to whether to continue to buy the food for the pet. Continued care and maintenance of the pet is an incidental part of the initial decision.
As another example, if a municipality is considering the acquisition of a large and expensive piece of equipment that requires ongoing outlays for fuel and maintenance, the crucial decision to be made by the voters is whether to make the initial purchase. If the voters approve the acquisition, they obviously approve of making the subsequent outlays necessary to keep the equipment operating. That is the situation before us in this case. The record does not disclose how or by whom the decision was made to establish a municipal power generating facility for the City of Idaho Falls. Regardless, that decision appears to have been made over a century ago and, when that decision was made, it was obvious that the City undertook to supply electrical power to its inhabitants and to acquire outside supplies when the production facilities did not provide adequate electric power to them. It was certainly contemplated that generation of power and acquisition of power supplies to fulfill the needs of its *581 citizens was required in the ordinary course of business to fulfill the initial obligation undertaken by the municipality.
When the delegates to the Idaho Constitutional Convention were debating article VIII, section 3, Judge William Claggett, the convention president, proposed the Proviso Clause out of concern that, without it, article VIII, section 3, “would prohibit the issuance of county scrip to pay the ordinary indebtedness absolutely imposed upon the county as provided by law, in case there should be any heavy expenses ... exceeding the current revenues of that year,” observing that article VIII, section 3 was “intended to apply to special indebtedness.” I.W. Hart, Proceedings and Debates of the Constitutional Convention of Idaho 587 (1912).[9] While the Legislature has not imposed an absolute duty upon municipalities to provide electrical power to their inhabitants, it has provided municipalities the authority to do so. See I.C. § 50-325. Once a municipality exercises that authority and constructs a power facility to supply the electric needs of its citizens, it certainly has undertaken a responsibility to continue that service in the manner most advantageous to its customers.
Judge Claggett went on to say:
We all know that in the practical administration of county government, that there will be sometimes be extraordinary expenses, I mean, extraordinary expenses in the ordinary administration of affairs. I am not speaking now with special indebtedness at all, but the ordinary general indebtedness which is incurred in the way of administration of county affairs.
Id. at 588. What he was saying is that sometimes ordinary expenses, as contemplated in his proviso, would reach an extraordinary level that would have to be met to carry out the ordinary function of the government and that such expenses should not have to be put to a vote. Again, he referred to special indebtedness as that which would require a vote under article VIII, section 3.
The cases decided since statehood have generally been decided in keeping with the comments made by Judge Claggett. That is, this Court has generally required new projects and construction to be first presented to the voters for approval under article VIII, section 3, but has declined to do so for ongoing functions, maintenance, reconstruction, refurbishing, and the like. Noting that early cases took a narrow view of the Proviso Clause, the Asson Court divided the decisions into two categories:
Expenditures held not to be ordinary and necessary include: the construction of bridges, [County of Ada v.] Bullen Bridge [Co., 5 Idaho 79, 47 P. 818 (1896)], Dunbar [v. Board of Comm’rs, 5 Idaho 407, 49 P. 409 (1897)]; construction of a wagon road, McNutt v. Lemhi Co., 12 Idaho 63, 84 P. 1054 (1906); purchase of a water system, Woodward v. City of Grangeville, 13 Idaho 652, 92 P. 840 (1907); construction of a schoolhouse addition, Petrie v. Common School Dist. [No. 5], 44 Idaho 92, 255 P. 318 (1927); purchase of a street sprinkler, Williams v. City of Emmett, 51 Idaho 500, 6 P.2d 475 (1931). Expenditures held to be within the ordinary and necessary exception include: salaries of city officers and employees, Butler v. Lewiston, 11 Idaho 393, 83 P. 234 (1905); repair of city waterworks, Hickey v. City of Nampa, 22 Idaho 41, 124 P. 280 (1912); construction of a jail in a newly created county, Jones v. *582 Power Co., 27 Idaho 656, 150 P. 35 (1915); maintenance of streets, Thomas v. Glindeman, 33 Idaho 394, 195 P. 92 (1921); cost of employing school teachers, Corum v. Common School Dist., 55 Idaho 725, 47 P.2d 889 (1935).
Comparison of these earlier cases reveals one clear distinction between those expenses held to be ordinary and necessary and those held not to be: new construction or the purchase of new equipment or facilities as opposed to repair, partial replacement or reconditioning of existing facilities. Thus, the court could hold that the city of Grangeville was not authorized, except by compliance with the requirements of Art. 8, § 3, to purchase an existing water system from the estate of a deceased city resident in the Woodward ease, supra, but could hold that the city of Nampa was authorized (without voter approval) to repair and restore its present water system after it was badly damaged in an attempt to put out a downtown fire in the Hickey case, supra. Similarly, the city of Moscow’s decision to improve its existing waterworks system and build a water storage tank, to provide a “more adequate water supply” was within the application of Art. 8, § 3 of the Constitution. Durand v. Cline, 63 Idaho 304, 119 P.2d 891 (1941). See also, Miller v. City of Buhl, 48 Idaho 668, 284 P. 843 (1930), (purchase of electric generating system, to be paid for from receipts from sale of power and light, held to be required to comply with Art. 8, § 3); O’Bryant v. City of Idaho Falls, 78 Idaho 313, 303 P.2d 672 (1956), (entering into agreement with natural gas distribution system to provide gas for city residents and vicinity held to be covered by requirements of Art. 8, § 3, Idaho Const.); Straughan v. City of Coeur d’Alene, 53 Idaho 494, 24 P.2d 321 (1932), (purchase by city of municipal lighting plant, and of waterworks system, held to be within application of Art. 8, § 3); Reynolds Construction Co. v. County of Twin Falls, 92 Idaho 61, 437 P.2d 14 (1968), (construction of courthouse annex covered by Art. 8, § 3).
While it is true that recent cases dealing with application of Idaho Const. Art. 8, § 3, have interpreted the “ordinary and necessary” language more broadly, they are not inconsistent with earlier case authority. In Hanson v. City of Idaho Falls, 92 Idaho 512, 446 P.2d 634 (1968), the court held that establishment of a “policeman’s retirement fund” was within the ordinary and necessary proviso, reasoning that it was merely an extension of the city’s salary compensation and support of its municipal law enforcement staff. Early cases were clear in ruling that salaries of municipal employees and related expenses are ordinary and necessary. See, Corum v. Common School Dist., supra; Butler v. Lewiston, supra.
105 Idaho at 441-42, 670 P.2d at 848-M9 (emphasis in original) (footnote omitted).
Interestingly enough, the Asson case involved power supply contracts. In that case, a group of citizens brought a petition for a writ of prohibition against five cities that entered into an agreement with the Washington Public Power Supply System (WPPSS) for future supplies of electrical power to be provided by a planned nuclear power plant project. 105 Idaho at 434, 670 P.2d at 841. Each of the five cities relied on outside electrical power in order to service its citizens. Id. The parties, in essence, entered into two agreements. Id. at 435, 670 P.2d at 842. The first agreement was for power from the first three phases of the project. Id. The second was for power from phases four and five of the project. Id. Under the latter agreement, the cities agreed to pay a portion of the costs of development and construction of two nuclear power plants in exchange for a credit for the purchase of future power generated by the plants. Id. The cities relied on the fact that they were specifically authorized by Idaho Code section 50-342 to contract with the federal government for the purchase and disposal of electric power. Id.
The citizens petitioned for the writ of prohibition when phases four and five of the project were terminated in 1982. Id. at 436, 670 P.2d at 843. Under the agreement, the cities were required to pay a proportionate share of $2.25 billion in bonds that were already issued to finance phases four and five. Id. The citizens alleged that the cities should be prohibited from making payment *583 on the bonds because the construction and purchase agreements violated article VIII, section 3 of the Idaho Constitution. Id. at 437, 670 P.2d at 844. In determining whether the expenditure under the agreements was ordinary and necessary for the purpose of article VIII, section 3, the Court noted that “[c]omparison of ... earlier cases reveals one clear distinction between those expenses held to be ordinary and necessary and those held not to be: new construction or the purchase of new equipment or facilities as opposed to repair, partial replacement or reconditioning of existing facilities.” Id. at 441-42, 670 P.2d at 848^19 (emphasis in original). Based on this view, the Court held that financing the construction of a new nuclear power plant was not ordinary and that the phase four and five agreement was void because it violated article VIII, section 3.
As for the agreement concerning phases one, two, and three, we noted that “the two sets of agreements are sufficiently different to make much of our holding not applicable even by analogy to the earlier agreements, which we perceive to be in the nature of power purchase contracts more than long-term debt obligations.” Id. at 443, 670 P.2d at 850 (emphasis added). The Court’s closing sentence indicates that it viewed power purchase contracts as being within the Proviso Clause, or outside the coverage of article VIII, section 3. It must be acknowledged that this latter issue was not before the Court for decision but, as mentioned above, it necessarily follows from the dichotomy which was established at the Constitutional Convention and which has since been observed by this Court.
Neither Frazier nor its underpinning decision, Dunbar, requires a different conclusion. In Dunbar the Court stated that to be exempt from the voting requirement under article VIII, section 3, an expenditure must not only be ordinary but that “there must exist a necessity for making the expenditure at or during such year.” 5 Idaho at 412, 49 P. at 411. However, the Court went on to conclude that the “building of a bridge and the payment of scalp bounties are not ordinary, but extraordinary, expenses.” Id. at 413, 49 P. 409. Finding that the expenditure was not ordinary, the Court had no need to rule upon the necessity prong, rendering as dicta the Court’s observation in that regard. The Frazier Court’s reliance on Dunbar for determining the necessity provision, therefore, is on rather infirm ground. Id. at 414, 49 P. at 411. Nevertheless, the Frazier Court merely followed the long-standing dichotomy between new construction, on the one hand, and maintenance of an existing project, on the other. The expensive new parking garage in Frazier was clearly not exempt under the Proviso Clause and, therefore, a vote was required under article VIII, section 3. And, it should be noted that the expenditures in Dunbar consisted of a new construction project and a new program for paying a bounty on rabbit scalps, placing the case on the voting requirement side of the dichotomy along with Frazier.
Although, as pointed out above, the constitutional framers did not contemplate the urgency aspect that the Dunbar Court mentioned in passing, the type of contract at issue here does required a certain amount of urgency on the part of the municipality, as the district court observed:
The City currently depends upon wholesale power supplies to meet electrical system requirements, since the City cannot supply all of the necessary electrical power on its own. Although it is within the City’s authority to purchase electrical power on the open market on an annual basis, such unstructured planning involves significant risk of market and price volatility (potentially exceeding the City’s budgeted fund for electrical power purchases) as well as the risk of lack of supply. Bonneville Power’s electric power rates are approximately one-half of current market rates and its supply of electric power is both stable and more flexible with regard to a supply of electrical power that approximates consumer demand.
The main contract at issue required a participation decision to be made by the municipal utility by a date certain (November 1, 2009) for the rate period of 2011-214. Supplemental power supply opportunities also required action by the municipality on relatively short notice. It is not a question of whether the *584 City of Idaho Palls could choose to purchase the supplemental power that these contracts would provide, because the City long ago undertook the responsibility to purchase and supply the necessary supplemental power, regardless of the timing or cost. The question presented was whether the City was going to purchase the power at the best available cost for the benefit of its customers. To require a vote to determine whether the City would choose the lower-cost wholesale contract, as opposed to picking up the necessary supplemental power at a higher cost as the need for the power became critical, would offend the concepts advanced by Judge Claggett in support of adoption of the Proviso Clause.
In order to obtain the benefit of advance purchases and fulfill its obligation to its citizens, the City must enter into an agreement or agreements for the purchase of power well in advance of the budget year in which that power will be consumed. In entering into such agreements, the City is providing for the basic electrical needs of it citizenry, as it has done since the turn of the last century. To hold that the City should be required to subject itself to the whims of the market, to risk greatly increasing the cost, and potentially deprive its citizens of a basic necessity, flies in the face of the framers’ intent that the Proviso Clause allow for the normal administration of government functions. Indeed, the Legislature has specifically authorized cities to enter into power purchase contracts (I.C. § 50-342) and to enter into joint ownership arrangements for power projects (I.C. § 50-342A). With regard to the latter provision, the Legislature declared:
securing long-term electric generation and transmission resources at cost-based rates is essential to the ability of municipal utilities to provide reliable and economic electric services at stable prices to the consumers and communities they serve and is essential to the economy and economic development of their communities and to the public health, safety and welfare.
The agreements in question here are, in Judge Claggett’s words, “extraordinary expenses in the ordinary administration of affairs ... the ordinary general indebtedness which is incurred in the way of administration of county affairs.” Accordingly, because the contract at issue here falls within the Proviso Clause, I would affirm the ruling of the district court.
Justice Pro Tern KIDWELL concurs.

. Claggett’s proviso amendment was supported by W.C.B. Allen who had earlier argued that article VIII, section 3 should be eliminated. His concern was that "in some of the counties of this [state] under the general law there is indebtedness which is greater than is provided for in this clause of the section, and which makes it a necessity to issue scrip at different times ..." Id. Both men were concerned with what Claggett called "extraordinary expenses in the ordinary administration of affairs,” which are an incident to "the practical administration of county government.” Id. at 588, 199 P.3d 102. Claggett was also supported by W.B. Heyburn, who wanted to insure that an expensive special election did not have to be called every time an extraordinary expense arose in the legitimate business of county government. Id. at 591, 199 P.3d 102. Only two delegates, George Ainsle and Orlando Batten, opposed the addition of the Proviso Clause because they feared it would completely circumvent the debt limitations contained in article VIII, section 3. Id. at 587, 589, 199 P.3d 102. Ultimately, what the delegates sought to do with the Proviso Clause was to allow the county to provide necessary services in extraordinary circumstances without the expense or necessity of a general election.