# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 36721

IN RE: THE VALIDITY OF THE POWER )
SALES AGREEMENT AND THE CREDIT- )
WORTHINESS AGREEMENT BETWEEN )
VERIFIED PETITION FOR THE CITY OF )
IDAHO FALLS JUDICIAL )
CONFIRMATION AND THE )
BONNEVILLE POWER )
ADMINISTRATION. )
-------------------------------------------------------- )
THE CITY OF IDAHO FALLS, )
            )
    Petitioner-Respondent, )
            )
v. )
            )
JARED FUHRIMAN, Mayor, )
            )
    Intervenor-Appellant. )

Boise, February 2010 Term

2010 Opinion No. 84

Filed: July 8, 2010

Stephen W. Kenyon, Clerk

---

Appeal from the District Court of the Seventh Judicial District, State of Idaho, Bonneville County. Hon. Darren B. Simpson, District Judge.

District court decision on power sales agreement, <u>reversed.</u>

Richardson & O'Leary, PLLC, Boise, for appellant. Mary "Molly" O'Leary argued.

Holden, Kidwell, Hahn & Crapo, PLLC, Idaho Falls, for respondent. Dale W. Storer argued.

Williams Bradbury, P.C. Boise, for amici curiae. Ronald L. Williams argued.

---

BURDICK, Justice

    Jared Fuhriman, mayor of the city of Idaho Falls, appeals the district court's order confirming the validity of a power sales agreement (PSA), and related creditworthiness

agreement (CA), pursuant to the Judicial Confirmation Law.[1]  Both agreements are between Idaho Falls's municipal electric utility Idaho Falls Power (IFP) and the United States of America, Department of Energy, acting by-and-through the Bonneville Power Administration (BPA). Fuhriman argues that the district court erred in finding that the city of Idaho Falls (Idaho Falls) could incur public liability by entering into the seventeen-year PSA without first submitting the PSA to a public vote.  Fuhriman argues that the obligations incurred by Idaho Falls under the PSA are ordinary, but not necessary, expenses under Article VIII, § 3 of the Idaho Constitution.[2]

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Idaho Falls owns and operates a municipal electric utility, IFP, which provides electricity to customers located within the established service area.  IFP owns two hydroelectric generation facilities, but these only generate approximately 10% of IFP's electricity needs, and Idaho Falls currently purchases the remainder of its electricity from BPA under a power purchase agreement that expires on September 30, 2011.

To replace the power purchase agreement that is set to expire, Idaho Falls intends to begin purchasing electricity from BPA pursuant to the PSA beginning October 1, 2011.  The PSA creates an obligation for Idaho Falls to purchase power and energy from BPA, and for BPA to sell power and energy to Idaho Falls, for a seventeen-year term commencing on October 1, 2011.  These obligations are firm unless an "uncontrollable force" precludes performance. Under the PSA, Idaho Falls will purchase "Slice"[3] and "Block"[4] products from BPA. BPA requires customers purchasing the "Slice" product to execute a creditworthiness agreement.  The CA provides that, upon the occurrence of certain events, Idaho Falls may be required to post cash or a letter of credit to secure its payment obligations under the PSA.

---

[1] Fuhriman has standing to file suit as an elector and taxpayer residing in the city of Idaho Falls.  *See Koch v. Canyon County*, 145 Idaho 158, 163, 177 P.3d 372, 377 (2008).

[2] Fuhriman challenges only the district court's finding that the PSA constitutes a "necessary" expense, therefore we offer no opinion as to whether the expense was "ordinary."

[3] With the "Slice" product, Idaho Falls will purchase a specified percentage of the output of the Federal Power System.  This percentage will be formally established prior to the beginning of power deliveries and is subject to adjustment from time to time pursuant to the provisions of the PSA.  The amount of power made available to Idaho Falls under the "Slice" product will vary with the actual generating output of the Federal Power System.  Section 5.1 of the PSA provides that the "Slice" product is a power sale and under no circumstances shall be construed as a sale of the resources or capability of the Federal Power System.

[4] With the "Block" product, Idaho Falls will purchase specified amounts of power each month.  The amounts of power will vary by month to reflect seasonal variations in the power requirements of the customers served by the System.  The specific amount of "Block" power to be purchased by Idaho Falls will be formally established prior to the beginning of power deliveries and will remain fixed for the term of the PSA.

Idaho Falls filed a petition under Idaho's Judicial Confirmation Law, I.C. § 7-1301, *et seq.*, on March 19, 2009, requesting a determination that Idaho Falls's obligations under the PSA are "ordinary and necessary expenses" under Article VIII, § 3, of the Idaho Constitution, and a determination that the CA did not create any new or additional obligation for Idaho Falls. On April 17, 2009, Fuhriman filed an answer in opposition arguing that, under this Court's holding in *City of Boise v. Frazier*, 143 Idaho 1, 137 P.3d 388 (2006), the obligations incurred under the PSA lack the requisite urgency needed to be considered necessary. Following a hearing on May 7, 2009, the district court issued its order on June 15, 2009, holding that any obligations incurred pursuant to the PSA are ordinary and necessary.

On July 14, 2009, Fuhriman filed a timely notice of appeal pursuant to I.C. § 7-1309. On August 10, 2009, Idaho Falls filed a motion for expedited hearing pursuant to Idaho Appellate Rule 44, and this Court granted the motion on September 2, 2009.

## II. STANDARD OF REVIEW

This Court aptly summarized the applicable standard of review in *Frazier*, as follows: "[t]his Court defers to the factual findings of the district court unless those findings are clearly erroneous. This Court exercises free review of the district court's application of the relevant law to the facts. Constitutional issues are questions of law over which we also exercise free review." 143 Idaho at 2, 137 P.3d at 389 (internal citations omitted).

## III. ANALYSIS

Cities in Idaho are generally barred from incurring debts or liabilities, in excess of the income and revenue provided for debts and liabilities in such year, unless they first conduct an election and secure voter approval of the proposed expenditure, as provided in Article VIII, § 3 of the Idaho Constitution.[5] *Frazier*, 143 Idaho at 2, 137 P.3d at 389. There is, however, one

---

[5] Article VIII, § 3 of the Idaho Constitution is titled "Limitations on county and municipal indebtedness," and states:

> *No* county, *city*, board of education, or school district, or other subdivision of the state, *shall incur any indebtedness, or liability, in any manner, or for any purpose, exceeding in that year, the income and revenue provided for it for such year, without the assent of two-thirds of the qualified electors thereof voting at an election* to be held for that purpose, nor unless, before or at the time of incurring such indebtedness, provisions shall be made for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and also to constitute a sinking fund for the payment of the principal thereof, within thirty years from the time of contracting the same. Any indebtedness or liability incurred contrary to this provision shall be void: *Provided, that this section shall not be construed to apply to the ordinary and necessary expenses authorized by the general laws of the state* and provided further that any city may own, purchase, construct, extend, or equip, within and without the corporate limits of such city, off street parking facilities,

relevant exception known as the "proviso clause" wherein no public vote is required if the expenditures constitute "ordinary and necessary expense[s] authorized by the general laws of the state." *Id.* at 3, 137 P.3d at 390 (quotation omitted).

Here, the district court initially expressed uncertainty as to whether the PSA should properly be considered as the incurring of an "indebtedness or liability" under the Idaho Constitution, as "a contract to buy power in the future is simply a promise to continue to pay for a municipal budgetary item in the future." The district court nevertheless recognized that it is "within the realm of reason" that Idaho Falls is incurring a new liability by entering into the PSA,[6] so the court analyzed the PSA and CA. The district court found that the CA is merely a security agreement, imposing no additional indebtedness or liabilities on Idaho Falls, and found that the liability incurred under the PSA constitutes an ordinary and necessary expense under the proviso clause.

## A. The Development of Article VIII, § 3 of the Idaho Constitution

---

public recreation facilities, and air navigation facilities, and, for the purpose of paying the cost thereof may, without regard to any limitation herein imposed, with the assent of two-thirds of the qualified electors voting at an election to be held for that purpose, issue revenue bonds therefor, the principal and interest of which to be paid solely from revenue derived from rates and charges for the use of, and the service rendered by, such facilities as may be prescribed by law, and provided further, that any city or other political subdivision of the state may own, purchase, construct, extend, or equip, within and without the corporate limits of such city or political subdivision, water system, sewage collection systems, water treatment plants, sewage treatment plants, and may rehabilitate existing electrical generating facilities, and for the purpose of paying the cost thereof, may, without regard to any limitation herein imposed, with the assent of a majority of the qualified electors voting at an election to be held for that purpose, issue revenue bonds therefor, the principal and interest of which to be paid solely from revenue derived from rates and charges for the use of, and the service rendered by such systems, plants and facilities, as may be prescribed by law; and provided further that any port district, for the purpose of carrying into effect all or any of the powers now or hereafter granted to port districts by the laws of this state, may contract indebtedness and issue revenue bonds evidencing such indebtedness, without the necessity of the voters of the port district authorizing the same, such revenue bonds to be payable solely from all or such part of the revenues of the port district derived from any source whatsoever excepting only those revenues derived from ad valorem taxes, as the port commission thereof may determine, and such revenue bonds not to be in any manner or to any extent a general obligation of the port district issuing the same, nor a charge upon the ad valorem tax revenue of such port district.

(Emphasis added).

[6] Indeed, under this Court's precedent it is clear that Idaho Falls is incurring a liability under the PSA. *See Hanson v. City of Idaho Falls*, 92 Idaho 512, 514, 446 P.2d 634, 636 (1968); *Feil v. City of Coeur d'Alene*, 23 Idaho 32, 49-50, 129 P. 643, 648-49 (1912); *Boise Dev. Co. v. City of Boise*, 26 Idaho 347, 359-361, 143 P. 531, 534-35 (1914). Even if the PSA is classified as a "pay-as-you-go" contract for services rendered, as it requires monthly payments for the electricity provided in the preceding month, it is still an incurred liability in that Idaho Falls will be obligated to pay under the contract regardless of whether funds are allocated under the city budget to pay for it.

4

In *Frazier*, this Court summarized the development of Article VIII, § 3 of the Idaho Constitution as follows:

> Article VIII, § 3 has been part of Idaho's Constitution since the beginning of statehood. The draft version of Article VIII, § 3 that was submitted to the 1889 Idaho Constitutional Convention was modeled after and nearly identical to Article XI, § 18 of the California Constitution of 1879. *See* 1 PROCEEDINGS AND DEBATES OF THE CONSTITUTIONAL CONVENTION OF IDAHO 1889, 589 (1912) (henceforth 1 PROCEEDINGS); CAL. CONST. of 1879, Art. XI, § 18. The intention was to prevent local government entities from incurring debts without approval from the voters and a clear plan to retire those debts. DONALD CROWLEY & FLORENCE HEFFRON, THE IDAHO STATE CONSTITUTION 170 (1994).

> Broadly speaking, Article VIII, § 3 imposes two requirements to be met by local governments before incurring indebtedness. The first requirement is a public election securing two-thirds of the vote, and the second is the collection of an annual tax sufficient to pay the debt within thirty years. The remainder of the section consists of exceptions to those requirements, beginning with the previously mentioned proviso clause and continuing with language added in a series of subsequent amendments not applicable to our analysis.

> When the draft version of Article VIII, § 3 was presented to the constitutional convention, it was amended by the delegates to add the words "provided, that this section shall not be construed to apply to the ordinary and necessary expenses authorized by the general laws of the state." *See* IDAHO CONST. art VIII, § 3; 1 PROCEEDINGS at 584-94. Delegate William Claggett offered the original proviso clause. *See* 1 PROCEEDINGS at 586. Claggett explained his intent to the other delegates, stating: "[w]e all know that in the practical administration of county government, that there sometimes will be extraordinary expenses, I mean extraordinary expenses in the ordinary administration of affairs." *Id.* at 588. By way of example, Claggett mentioned the payment of witness fees. *Id.* Other delegates mentioned juror fees and criminal court expenses, *id.* at 590, the expense of controlling streams and ditches, *id.* at 592, and "any emergency" *id.* at 587.

143 Idaho at 3-4, 137 P.3d at 390-91.

**B. The liability incurred under the PSA is not "necessary" under the proviso clause of Article VIII, § 3 of the Idaho Constitution.**

In *Frazier*, this Court considered whether the City of Boise could incur long-term indebtedness in financing an expansion of the City's airport parking facilities without first submitting the project to a vote. 143 Idaho at 2, 137 P.3d at 389. This Court, in holding that the project did not fit within the proviso clause, wrote that "in order for an expenditure to qualify as 'necessary' under the proviso clause of Article VIII, § 3 there must exist a necessity for making the expenditure *at or during such year.*" 143 Idaho at 5, 137 P.3d at 392 (emphasis added).

"The required urgency can result from a number of possible causes, such as threats to public safety, the need for repairs, maintenance, or preservation of existing property, or a legal obligation to make the expenditure without delay." *Id.* at 6-7, 137 P.3d at 393-94 (internal citations omitted).

Applying the *Frazier* analysis to the facts of this case, the liability that Idaho Falls is incurring under the PSA cannot reasonably be said to be "necessary" as there is no reason the liability had to be incurred in the year in which the contract was signed. The purchase of electricity under the PSA will not commence until October 1, 2011, and will continue for seventeen years thereafter. Clearly there was no urgency which required that the agreement be entered into "during such year" that it was entered into as ample time existed during which Idaho Falls could have submitted this proposed contract to its taxpayers for a confirmatory vote.

Idaho Falls makes the argument that *Frazier* is not properly read as imposing a bright-line rule that in order for an expenditure to be "necessary" it must be urgent, but this is inconsistent with the plain reading of *Frazier*. Idaho Falls urges this Court to distinguish *Frazier* and limit the necessity-requires-urgency analysis to cases involving large capital projects, such as the expansion of an airport parking garage, and not to apply the analysis to cases of extraordinary indebtedness or liabilities that arise in the ordinary administration of local government affairs, such as repairs, maintenance, city employees' salaries, etc.[7]

In support of its argument, Idaho Falls cites statements made by Delegate William Claggett at Idaho's Constitutional Convention when he was proposing the proviso clause, where he distinguished between extraordinary expenses that arise in the ordinary administration of affairs, and special indebtedness which does not. *See* I.W. Hart, *Proceedings and Debates of the Constitutional Convention of Idaho*, 588-89 (1912). Idaho Falls argues that Claggett's statements indicate that Claggett, and the other framers of Idaho's Constitution, intended for the proviso clause to make an exception for indebtedness and liabilities where the "character" of that debt can fairly be classified as "the type of debt that arises under the ordinary administration of local government affairs" whether or not an element of urgency is present.[8] Idaho Falls appears

---

[7] As noted above, in *Frazier* this Court recognized that repairs and maintenance satisfy the urgency requirement as they are related to public safety.

[8] In arguing for this distinction, Idaho Falls writes: "Perceptive observers then and now have recognized that presenting every issue of multi-year municipal debt to the voters would be impractical and completely unworkable." In support of this contention, Idaho Falls cites to Justice J. Jones's special concurrence in *In re University*

6

to advocate a "know it when we see it" factual inquiry for determining whether liabilities or indebtedness incurred by counties or municipalities are "ordinary and necessary." We shall not stray from the principle of *stare decisis* without an exceptionally compelling reason to do so, particularly where doing so would be a move to embrace ambiguity over order.

It is also argued that Idaho Falls – acting through IFP –having chosen to provide electricity to their constituents, has an obligation to continue to provide sufficient electricity to meet their constituents' needs. Assuming, arguendo, that this is true, this merely means that IFP's expenditures to obtain adequate electricity for its customers on *a short term basis* is "necessary" under the proviso clause. In *Bannock County v. C. Bunting & Co.*, this Court found Bannock County's expenditures for the provision of a temporary jail were ordinary and necessary. 4 Idaho 156, 37 P. 277 (1894) *overruled in part on other grounds by Veatch v. City of Moscow*, 18 Idaho 313, 109 P. 722 (1910). However, we went on to clarify that, although Bannock County was obligated to provide a facility to act as a jail, "such rooms must be temporarily provided, at as little expense as is consistent with providing suitable quarters, until the question can be submitted to the people." *Id*. at 168, 37 P. at 281. In accordance with this reasoning Idaho Falls must obtain electricity on a temporary basis unless and until a long-term agreement is confirmed by two-thirds of its qualified electors.

Idaho Falls argues that purchasing power on an annual, or monthly, basis would subject the City to significant market risk and price volatility. This is likely true; however, this does not mean that Idaho Falls may incur a long-term liability for a short term need, absent a confirmatory vote. As this Court stated in *Frazier*:

> The Idaho Constitution is imbued with the spirit of economy, and in so far as possible it imposes upon the political subdivisions of the state a pay-as-you-go system of finance. The rule is that, without the express assent of the qualified electors, municipal officers are not to incur debts for which they have not the funds to pay. Such policy entails a measure of crudity and inefficiency in local government, but doubtless the men who drafted the Constitution, having in mind disastrous examples of optimism and extravagance on the part of public officials,

---

*Place/Idaho Water Center Project*, 146 Idaho 527, 547, 199 P.3d 102, 122 (2008) (J. Jones, J., specially concurring), where he wrote that "[i]t is a virtual impossibility to present every multi-year governmental contract or lease to the public for a vote." Interestingly enough, when that statement is placed in context it is apparent that Justice Jones was not arguing that multi-year contracts are not subject to voting requirements under Article VIII, § 3, or that multi-year debts or liabilities may be incurred under these contracts in the absence of urgency; on the contrary, he was explaining why "leases and other contracts that are intended to extend beyond one year always contain provisions (1) making the government's performance subject to availability of appropriated funds and (2) making the agreement renewable on an annual basis for the contemplated term." *Id.*

> thought best to sacrifice a measure of efficiency for a degree of safety. The careful, thrifty citizen sometimes gets along with a crude instrumentality until he is able to purchase and pay for something better. And likewise, under the Constitution, county officers must use the means they have for making fair and equitable assessments until they are able to pay for something more efficient or obtain the consent of those in whose interests they are supposed to act.

143 Idaho at 5, 137 P.3d at 392 (quoting *Williams v. City of Emmett*, 51 Idaho 500, 505, 6 P.2d 475, 476 (1931)). If the purchase price of electricity under the PSA is preferable to the rates, factoring in potential market volatility, available under short term contracts it is all the more likely that the qualified electors would vote to confirm the PSA.

Therefore, we hold that, under our precedent in *Frazier*, the PSA is not "necessary" under the meaning of Article VIII, § 3 of the Idaho Constitution, and does not fit within the proviso clause.

## IV. CONCLUSION

We hold that the PSA constitutes a liability exceeding the income and revenue provided for it in the year in which it was incurred, did not receive the assent of two-thirds of the qualified voting electorate, and did not fit into the exception to this requirement under the proviso clause. Therefore, we reverse the district court's confirmation of the validity of the PSA.

Chief Justice EISMANN and Justice HORTON, **CONCUR.**

J. JONES, J., dissenting.

I dissent because I am unable to agree with the Court's conclusion that article VIII, section 3 requires a vote of the people for contracts providing necessary supplies to carry on an on-going and long-standing municipal service. The framers of the Idaho Constitution were practical people. Their words and deeds indicate a dichotomy between new programs or construction, which were to require a vote of the people, and support of existing governmental functions, which were to be exempt from a vote by virtue of the Proviso Clause. As we observed in *Asson v. City of Burley*, 105 Idaho 432, 670 P.2d 839 (1983), that dichotomy has long been recognized in our decisions. It makes sense and should continue to be observed.

The concept I advance is by no means revolutionary. It plays a part in our everyday life. For example, when the family is considering the acquisition of a household pet, the decision must be made with deliberation and care. All of the pros and cons need to be carefully weighed before taking on the obligations attendant with a pet. After all, there will be much involved in the continuing feeding and care of the animal. Once the pet is acquired, the attendant and anticipated

8

long-term obligations kick in. There is no longer the need for careful deliberation with regard to whether to continue to buy the food for the pet. Continued care and maintenance of the pet is an incidental part of the initial decision.

As another example, if a municipality is considering the acquisition of a large and expensive piece of equipment that requires ongoing outlays for fuel and maintenance, the crucial decision to be made by the voters is whether to make the initial purchase. If the voters approve the acquisition, they obviously approve of making the subsequent outlays necessary to keep the equipment operating. That is the situation before us in this case. The record does not disclose how or by whom the decision was made to establish a municipal power generating facility for the City of Idaho Falls. Regardless, that decision appears to have been made over a century ago and, when that decision was made, it was obvious that the City undertook to supply electrical power to its inhabitants and to acquire outside supplies when the production facilities did not provide adequate electric power to them. It was certainly contemplated that generation of power and acquisition of power supplies to fulfill the needs of its citizens was required in the ordinary course of business to fulfill the initial obligation undertaken by the municipality.

When the delegates to the Idaho Constitutional Convention were debating article VIII, section 3, Judge William Claggett, the convention president, proposed the Proviso Clause out of concern that, without it, article VIII, section 3, "would prohibit the issuance of county scrip to pay the ordinary indebtedness absolutely imposed upon the county as provided by law, in case there should be any heavy expenses . . . exceeding the current revenues of that year," observing that article VIII, section 3 was "intended to apply to special indebtedness." I.W. HART, PROCEEDINGS AND DEBATES OF THE CONSTITUTIONAL CONVENTION OF IDAHO 587 (1912).[9] While the Legislature has not imposed an absolute duty upon municipalities to provide electrical power

---

[9] Claggett's proviso amendment was supported by W.C.B. Allen who had earlier argued that article VIII, section 3 should be eliminated. His concern was that "in some of the counties of this [state] under the general law there is indebtedness which is greater than is provided for in this clause of the section, and which makes it a necessity to issue scrip at different times . . ." *Id.* Both men were concerned with what Claggett called "extraordinary expenses in the ordinary administration of affairs," which are an incident to "the practical administration of county government." *Id.* at 588. Claggett was also supported by W.B. Heyburn, who wanted to insure that an expensive special election did not have to be called every time an extraordinary expense arose in the legitimate business of county government. *Id.* at 591. Only two delegates, George Ainsle and Orlando Batten, opposed the addition of the Proviso Clause because they feared it would completely circumvent the debt limitations contained in article VIII, section 3. *Id.* at 587, 589. Ultimately, what the delegates sought to do with the Proviso Clause was to allow the county to provide necessary services in extraordinary circumstances without the expense or necessity of a general election.

to their inhabitants, it has provided municipalities the authority to do so. *See* I.C. § 50-325. Once a municipality exercises that authority and constructs a power facility to supply the electric needs of its citizens, it certainly has undertaken a responsibility to continue that service in the manner most advantageous to its customers.

> Judge Claggett went on to say:

> We all know that in the practical administration of county government, that there will be sometimes be extraordinary expenses, I mean, extraordinary expenses in the ordinary administration of affairs. I am not speaking now with special indebtedness at all, but the ordinary general indebtedness which is incurred in the way of administration of county affairs.

*Id.* at 588. What he was saying is that sometimes ordinary expenses, as contemplated in his proviso, would reach an extraordinary level that would have to be met to carry out the ordinary function of the government and that such expenses should not have to be put to a vote. Again, he referred to special indebtedness as that which would require a vote under article VIII, section 3.

The cases decided since statehood have generally been decided in keeping with the comments made by Judge Claggett. That is, this Court has generally required new projects and construction to be first presented to the voters for approval under article VIII, section 3, but has declined to do so for on-going functions, maintenance, reconstruction, refurbishing, and the like. Noting that early cases took a narrow view of the Proviso Clause, the *Asson* Court divided the decisions into two categories:

> Expenditures held *not* to be ordinary and necessary include: the construction of bridges, [*County of Ada v*.] *Bullen Bridge* [*Co*., 5 Idaho 79, 47 P. 818 (1896)]*, Dunbar* [*v. Board of Comm'rs*, 5 Idaho 407, 49 P. 409 (1897)]; construction of a wagon road, *McNutt v. Lemhi Co.,* 12 Idaho 63, 84 P. 1054 (1906); purchase of a water system, *Woodward v. City of Grangeville,* 13 Idaho 652, 92 P. 840 (1907); construction of a schoolhouse addition, *Petrie v. Common School Dist.* [*No. 5*]*,* 44 Idaho 92, 255 P. 318 (1927); purchase of a street sprinkler, *Williams v. City of Emmett,* 51 Idaho 500, 6 P.2d 475 (1931). Expenditures held to be within the ordinary and necessary exception include: salaries of city officers and employees, *Butler v. Lewiston,* 11 Idaho 393, 83 P. 234 (1905); repair of city waterworks, *Hickey v. City of Nampa,* 22 Idaho 41, 124 P. 280 (1912); construction of a jail in a newly created county, *Jones v. Power Co.,* 27 Idaho 656, 150 P. 35 (1915); maintenance of streets, *Thomas v. Glindeman,* 33 Idaho 394, 195 P. 92 (1921); cost of employing school teachers, *Corum v. Common School Dist.,* 55 Idaho 725, 47 P.2d 889 (1935).

Comparison of these earlier cases reveals one clear distinction between those expenses held to be ordinary and necessary and those held not to be: *new* construction or the purchase of *new* equipment or facilities as opposed to repair, partial replacement or reconditioning of existing facilities. Thus, the court could hold that the city of Grangeville was not authorized, except by compliance with the requirements of Art. 8, § 3, to purchase an existing water system from the estate of a deceased city resident in the *Woodward* case, *supra,* but could hold that the city of Nampa was authorized (without voter approval) to repair and restore its present water system after it was badly damaged in an attempt to put out a downtown fire in the *Hickey* case, *supra.* Similarly, the city of Moscow's decision to *improve* its existing waterworks system and build a water storage tank, to provide a "more adequate water supply" was within the application of Art. 8, § 3 of the Constitution. *Durand v. Cline,* 63 Idaho 304, 119 P.2d 891 (1941). *See also, Miller v. City of Buhl,* 48 Idaho 668, 284 P. 843 (1930), (purchase of electric generating system, to be paid for from receipts from sale of power and light, held to be required to comply with Art. 8, § 3); *O'Bryant v. City of Idaho Falls,* 78 Idaho 313, 303 P.2d 672 (1956), (entering into agreement with natural gas distribution system to provide gas for city residents and vicinity held to be covered by requirements of Art. 8, § 3, Idaho Const.); *Straughan v. City of Coeur d'Alene,* 53 Idaho 494, 24 P.2d 321 (1932), (purchase by city of municipal lighting plant, and of waterworks system, held to be within application of Art. 8, § 3); *Reynolds Construction Co. v. County of Twin Falls,* 92 Idaho 61, 437 P.2d 14 (1968), (construction of courthouse annex covered by Art. 8, § 3).

While it is true that recent cases dealing with application of Idaho Const. Art. 8, § 3, have interpreted the "ordinary and necessary" language more broadly, they are not inconsistent with earlier case authority. In *Hanson v. City of Idaho Falls*, 92 Idaho 512, 446 P.2d 634 (1968), the court held that establishment of a "policeman's retirement fund" was within the ordinary and necessary proviso, reasoning that it was merely an extension of the city's salary compensation and support of its municipal law enforcement staff. Early cases were clear in ruling that salaries of municipal employees and related expenses are ordinary and necessary. *See, Corum v. Common School Dist., supra; Butler v. Lewiston, supra.*

105 Idaho at 441–42, 670 P.2d at 848–49 (emphasis in original) (footnote omitted).

Interestingly enough, the *Asson* case involved power supply contracts. In that case, a group of citizens brought a petition for a writ of prohibition against five cities that entered into an agreement with the Washington Public Power Supply System (WPPSS) for future supplies of electrical power to be provided by a planned nuclear power plant project. 105 Idaho at 434, 670 P.2d at 841. Each of the five cities relied on outside electrical power in order to service its citizens. *Id.* The parties, in essence, entered into two agreements. *Id.* at 435, 670 P.2d at 842. The first agreement was for power from the first three phases of the project. *Id.* The second was for power from phases four and five of the project. *Id.* Under the latter agreement, the cities agreed

11

to pay a portion of the costs of development and construction of two nuclear power plants in exchange for a credit for the purchase of future power generated by the plants. *Id.* The cities relied on the fact that they were specifically authorized by Idaho Code section 50-342 to contract with the federal government for the purchase and disposal of electric power. *Id.*

The citizens petitioned for the writ of prohibition when phases four and five of the project were terminated in 1982. *Id.* at 436, 670 P.2d at 843. Under the agreement, the cities were required to pay a proportionate share of $2.25 billion in bonds that were already issued to finance phases four and five. *Id.* The citizens alleged that the cities should be prohibited from making payment on the bonds because the construction and purchase agreements violated article VIII, section 3 of the Idaho Constitution. *Id.* at 437, 670 P.2d at 844. In determining whether the expenditure under the agreements was ordinary and necessary for the purpose of article VIII, section 3, the Court noted that "[c]omparison of . . . earlier cases reveals one clear distinction between those expenses held to be ordinary and necessary and those held not to be: *new* construction or the purchase of *new* equipment or facilities as opposed to repair, partial replacement or reconditioning of existing facilities." *Id.* at 441–42, 670 P.2d at 848–49 (emphasis in original). Based on this view, the Court held that financing the construction of a new nuclear power plant was not ordinary and that the phase four and five agreement was void because it violated article VIII, section 3.

As for the agreement concerning phases one, two, and three, we noted that "the two sets of agreements are sufficiently different *to make much of our holding not applicable even by analogy to the earlier agreements*, which we perceive to be in the nature of power purchase contracts more than long-term debt obligations." *Id.* at 443, 670 P.2d at 850 (emphasis added). The Court's closing sentence indicates that it viewed power purchase contracts as being within the Proviso Clause, or outside the coverage of article VIII, section 3. It must be acknowledged that this latter issue was not before the Court for decision but, as mentioned above, it necessarily follows from the dichotomy which was established at the Constitutional Convention and which has since been observed by this Court.

Neither *Frazier* nor its underpinning decision, *Dunbar,* requires a different conclusion. In *Dunbar* the Court stated that to be exempt from the voting requirement under article VIII, section 3, an expenditure must not only be ordinary but that "there must exist a necessity for making the expenditure at or during such year." 5 Idaho at 412, 49 P. at 411. However, the Court went on to

conclude that the "building of a bridge and the payment of scalp bounties are not ordinary, but extraordinary, expenses." *Id.* at 413. Finding that the expenditure was not ordinary, the Court had no need to rule upon the necessity prong, rendering as dicta the Court's observation in that regard. The *Frazier* Court's reliance on *Dunbar* for determining the necessity provision, therefore, is on rather infirm ground. *Id.* at 414, 49 P. at 411. Nevertheless, the *Frazier* Court merely followed the long-standing dichotomy between new construction, on the one hand, and maintenance of an existing project, on the other. The expensive new parking garage in *Frazier* was clearly not exempt under the Proviso Clause and, therefore, a vote was required under article VIII, section 3. And, it should be noted that the expenditures in *Dunbar* consisted of a new construction project and a new program for paying a bounty on rabbit scalps, placing the case on the voting requirement side of the dichotomy along with *Frazier*.

Although, as pointed out above, the constitutional framers did not contemplate the urgency aspect that the *Dunbar* Court mentioned in passing, the type of contract at issue here does required a certain amount of urgency on the part of the municipality, as the district court observed:

> The City currently depends upon wholesale power supplies to meet electrical system requirements, since the City cannot supply all of the necessary electrical power on its own. Although it is within the City's authority to purchase electrical power on the open market on an annual basis, such unstructured planning involves significant risk of market and price volatility (potentially exceeding the City's budgeted fund for electrical power purchases) as well as the risk of lack of supply. Bonneville Power's electric power rates are approximately one-half of current market rates and its supply of electric power is both stable and more flexible with regard to a supply of electrical power that approximates consumer demand.

The main contract at issue required a participation decision to be made by the municipal utility by a date certain (November 1, 2009) for the rate period of 2011–214. Supplemental power supply opportunities also required action by the municipality on relatively short notice. It is not a question of whether the City of Idaho Falls could choose to purchase the supplemental power that these contracts would provide, because the City long ago undertook the responsibility to purchase and supply the necessary supplemental power, regardless of the timing or cost. The question presented was whether the City was going to purchase the power at the best available cost for the benefit of its customers. To require a vote to determine whether the City would choose the lower-cost wholesale contract, as opposed to picking up the necessary supplemental

power at a higher cost as the need for the power became critical, would offend the concepts advanced by Judge Claggett in support of adoption of the Proviso Clause.

In order to obtain the benefit of advance purchases and fulfill its obligation to its citizens, the City must enter into an agreement or agreements for the purchase of power well in advance of the budget year in which that power will be consumed. In entering into such agreements, the City is providing for the basic electrical needs of it citizenry, as it has done since the turn of the last century. To hold that the City should be required to subject itself to the whims of the market, to risk greatly increasing the cost, and potentially deprive its citizens of a basic necessity, flies in the face of the framers' intent that the Proviso Clause allow for the normal administration of government functions. Indeed, the Legislature has specifically authorized cities to enter into power purchase contracts (I.C. § 50-342) and to enter into joint ownership arrangements for power projects (I.C. § 50-342A). With regard to the latter provision, the Legislature declared:

> securing long-term electric generation and transmission resources at cost-based rates is essential to the ability of municipal utilities to provide reliable and economic electric services at stable prices to the consumers and communities they serve and is essential to the economy and economic development of their communities and to the public health, safety and welfare.

The agreements in question here are, in Judge Claggett's words, "extraordinary expenses in the ordinary administration of affairs . . . the ordinary general indebtedness which is incurred in the way of administration of county affairs." Accordingly, because the contract at issue here falls within the Proviso Clause, I would affirm the ruling of the district court.

Justice Pro Tem KIDWELL CONCURS.